KING, C.J., for the Court.
¶ 1. Bobby L. Travis was convicted of burglary of the home of a Jackson resident and sentenced to a term of twenty-five years in the custody of the Mississippi Department of Corrections with fifteen years to serve, ten years suspended, and five years of supervised probation.
¶ 2. He raises two issues on appeal: (1) that the trial court erred in denying his *322 motion to dismiss for failure to provide a speedy trial and (2) that the trial court erred in denying his motion for a new trial as the weight of the evidence was insufficient to sustain the jury’s verdict.
¶ 3. Finding no error in the proceedings below, we affirm.
FACTS
¶ 4. Boris Hines, the manager of the Green Hill Apartments at 355 Green Hill Place in Jackson, was brutally attacked in his apartment following a home invasion on May 6, 2003. His arms and legs were bound, and a plastic bag was placed over his head by two men who pushed their way into the apartment when his roommate, Quala Watson, opened the door. Watson was lured to the door by a telephone call from an unknown female who told Hines that someone was trying to break into Watson’s car. The men wore ski masks and wielded guns. Hines was thrown on the bed by the men, who stated that he “owed the boss” $5,000. Hines denied owing anyone money. Hines said that he was struck and was beaten by the men with their fists and guns. Hines said that as he lay helpless and in fear of his life, he heard the men ransacking his apartment. The men took him to the living room, sat him down, wrapped him in a sheet or a blanket, and put a laundry basket over his head. They led him outside and stuffed him in the trunk of a car and drove away. They rode for less than an hour and then stopped. Hines said he could hear the two men talking while they were riding around, but he was unable to recognize the voices or tell what they were saying. When the car stopped they took Hines out of the trunk. One of the men again told Hines that he owed the boss money and said, “we’re going to show you how we do it in New Orleans.” At that point a gun was fired. Hines testified that he was not hit by the gunshot. Hines testified he was terrified because he was still bound, completely covered, and was having difficulty breathing. The men then placed him in another vehicle along with Watson. They rode for a short time and then the men left Hines alone in a car on Redwood Avenue in Jackson. Having waited long enough to insure that the men were gone, Hines broke free and went to a nearby home and called the police. The police arrived and took him back to his apartment; Watson was there. Hines found that the apartment was in shambles and that his computer, DVD/VCR, thirty-four videotapes, and some crystal had been stolen. The robbers had taken his keys, which included the keys to all of the apartments in the complex, and they had taken Watson’s keys. Hines described his injuries as broken teeth and a “busted” lip from being hit, and a cut in the back of his head. Hines was never able to identify the assailants. They wore ski masks, and they covered his head during the entire ordeal. He did note that one was tall and one was short.
¶ 5. Hines testified that, as the apartment manager, he was having problems with Travis regarding his payment of rent. Travis and his girlfriend moved into the apartment complex about two to three months before the incident. They paid the deposit and moved into the apartment. Hines told Travis that he would pro rate his rent. When it came time to pay the rent, Hines said that Travis would not pay it. Hines said that he started leaving notes asking Travis to see him. After Travis ignored the notes, Hines decided rather than lose his job as the apartment manager it was necessary to evict Travis. Hines testified that he gave Travis a final notice, and approximately the first of the next week, the home invasion happened.
*323 ¶ 6. Jackson Police Officer Letisha Gibbs was dispatched to Hines’s apartment as a result of Hines’s call. As she entered the complex, she saw an oncoming red extended cab pickup truck slow its speed and then shut off its headlights. The driver slumped down into the seat so as not to be seen. Deeming this suspicious, the officer ordered the driver to put his hands out of the window. As she approached the car, she saw a handgun on the seat beside the driver. The driver was identified as seventeen-year-old Earltavious Markee Jones. Jones was dressed in a black jumpsuit; the officer found a blue ski mask and a cell phone in Jones’s pockets. After ordering Jones out of the truck, Officer Gibbs discovered that he had been sitting on top of a second handgun. In securing the weapon, the officer found five bullets and one spent cartridge. The officer then noticed a pillowcase filled with VCR tapes on the floorboard of the truck. She also found a computer hard drive. Another officer arrived on the scene and advised Officer Gibbs that the items found in the truck had been reported stolen by Hines. Back at his apartment, Hines identified the recovered items. Officer Gibbs described Hines as shaky. She said that he looked frightened, and he was so upset “he really didn’t know how to talk.” She described him as bloody all over, with a “busted” lip, a cut on his back, and bruises on his wrists and back.
¶ 7. Jones, Travis’s cousin, was indicted along with Travis for burglary of a dwelling and kidnaping in connection with the incident. Jones lived on Redwood Avenue in Jackson with his aunt. Jones pled guilty to the charge of burglary of a dwelling and was awaiting sentencing at the time of Travis’s trial. For his guilty plea to the house burglary charge and his testimony against Travis, the kidnaping charge against Jones was dropped.
¶ 8. Jones testified that on the night of the incident he, Travis, and an individual named David, whom he did not know, were going to spend the night with Travis at his apartment, which was in the Green Hill apartments-next door to the victim, Hines. The three left Travis’s sister’s house to go to Travis’s apartment in a red Nissan truck that Travis drove. He said when Travis got to his apartment, he found that the electricity was off. Travis told Jones he would get some items from his apartment and go back to his sister’s house. According to Jones, Travis got out of the truck, pulled a .38 caliber pistol from under the seat, and, along with David, went to the apartment that was later identified as that of Hines. Jones stated when someone came to the door, Travis and David ran in with the weapon and stayed inside the apartment for about fifteen minutes.
¶ 9. Jones stated that he remained in the truck. Jones said that Travis and David were dressed in all black clothing and were escorting a man and.a woman out of the apartment. He said the hands of the man and woman were tied, and there was something across their eyes. Jones said he did not see Travis and David put a mask on before entering the apartment, nor did he see them wearing masks when they came out with the couple. According to Jones, the man was put on the back seat of the truck, and they attempted to put the female in the back of the pickup with Jones, so he got out. Jones said he was unaware that they were going to kidnap people that night, and it was only when Travis and David brought the two people out that he realized what was going on. Jones said after placing them in the truck, Travis and David took off leaving him standing on the side of the apartment building.
¶ 10. After about an hour, Jones said Travis, David, and the female came back. *324 The female was still bound, and her eyes were still covered. Jones heard Travis tell the female that she would not be hurt if she cooperated. He said Travis told her that all she had to do was to call Hines’s father and tell him that Hines owed Travis $5,000. Jones said they stayed in the apartment for about ten minutes, while he remained outside. According to Jones, Travis and David returned to the truck with four laundry bags “full of stuff’ that were put on the back of the truck. Jones said that Travis told him the stuff had come out of Travis’s apartment. The female did not come back with them. Travis retrieved an automobile from the other side of the building. He then told David to drive the pickup truck back to his sister’s house. However, David refused because he did not know the owner of the vehicle. At that point, Jones volunteered to drive the truck back to Travis’s sister’s house, even though he did not have a driver’s license. Travis and David left in the automobile. Jones smoked a cigarette, then got in the truck, and left about five minutes later. While leaving, he saw a police officer approaching. Jones was approached by Officer Gibbs who found the two guns and the laundry bags full of items in the truck and placed him under arrest. Jones was taken to the police station where he gave a statement to Detective Keith Denson. Detective Denson testified that he responded to a home invasion call, meaning that there had been a burglary as well as a possible armed robbery and assault. Upon arrival, he noticed a red Nissan pickup truck. Denson testified that Hines’s apartment was in disarray with items turned over and scattered throughout the apartment. The detective said that Watson was at the apartment when he arrived, but Hines had not yet arrived. After talking to Jones, Detective Denson said the police had two possible suspects: Travis and a man known only as David. Travis, who was thirty-three years old at the time of the crime, turned himself in on charges connected with the case on August 13, 2003. The detective said that police never determined David’s identity. Detective Denson said that policemen from another precinct transported Hines back to his apartment shortly after Denson got there. They picked Hines up from a location on Redwood Avenue where he said he had escaped from an automobile. The detective said that when the police went to the site they found an abandoned automobile in front of an abandoned house. He said that inside the car were a sheet, an electrical cord, and a bloody T-shirt, consistent with someone being assaulted. The detective also said that there was a Ford Festiva automobile parked on the street directly in front of the apartment building which belonged to Travis. Inside the vehicle in plain view was a dark colored ski mask. Detective Denson said he received a search warrant for the car and inside were found a set of keys to all of the apartments in the complex, a set of keys that belonged to Watson, and a set of crystal ware, all items that had been reported stolen.
¶ 11. Travis did not testify at trial and called only two witnesses. He recalled Detective Denson who testified that fingerprints lifted from the Nissan pickup matched neither Travis nor Jones. Travis called Jackson Police Officer Charles Taylor who testified that he processed the crime scene at 335 Green Hill Place. He said that he collected evidence from a red 1998 Nissan Frontier pickup that included a Dell computer keyboard, two computer speakers, a computer mouse, a power cord, an IBM computer and monitor, a blue knit mask, thirty-four videotapes, and a pillowcase. He also collected a palm print from the vehicle that did not match Travis or Jones. He described Hines’s apartment as appearing “ransacked” with dresser draw *325 ers pulled out and clothes on the floor. The officer testified that he could see empty spaces where a VCR and a computer had been. Officer Taylor also processed the Redwood Avenue location where a car was abandoned. He said the abandoned car was a 1990 gray or silver Buick Century and he did not take any fingerprints. Officer Taylor said that fingerprints were not taken from the apartment.
¶ 12. The jury returned a not guilty verdict on the kidnaping charge against Travis and a guilty verdict on the burglary of a dwelling charge. The trial court denied posttrial motions, and this appeal ensued.
ANALYSIS
I. WHETHER THE TRIAL COURT ERRED IN DENYING TRAVIS’S MOTION TO DISMISS FOR FAILURE TO GRANT A SPEEDY TRIAL.
¶ 13. In his first argument, Travis alleges that the trial court erred in denying his claims of violation of his state and federal constitutional rights to a speedy trial. He notes that he filed a pro se[1] “Motion for Dismissal” on January 13, 2005, in which he pointed out that he was arrested on August 13, 2003, and twenty-one months later, he still had not been tried. Citing Smith v. State, 550 So.2d 406, 407 (Miss.1989), the motion said that any delay of eight months from arrest to trial is presumptively prejudicial and asked the trial court to dismiss the charges against Travis.
¶ 14. The motion was not brought on for hearing until his trial date, August 9, 2006. The defense counsel called Travis to testify about the delay. Travis confirmed the date of his arrest, August 13, 2003; the date of his indictment, June 8, 2004; and his arraignment date of August 2, 2004. He said that his job prior to his arrest was as an in-state and out-of-state truck driver. Because of the charges, he was unable to leave the state to make runs, thus affecting his ability to make a living. He also testified that two witnesses who could provide him with an alibi had died during the pendency of the charges against him.
¶ 15. Ruling from the bench, the trial judge denied the motion. He determined that Travis had failed to pursue the motion to a decision; therefore, it was abandoned pursuant to Rule 2.04 of the Uniform Rules of Circuit and County Court.[2] The judge said that an alternative reason for the denial was that Travis had a hearing on January 25, 2005, before another judge and that he was released on bond the next day.
¶ 16. The trial judge then proceeded to conduct a Barker analysis to determine whether Travis’s right to a speedy trial had been violated. Barker v. Wingo, 407 U.S. 514, 529-34, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The Barker factors, which must be balanced in light of the totality of the circumstances when determining whether there was a violation of the speedy trial right, are: (1) the length of the delay, (2) reason for the delay, (3) the defendant’s assertion of his right to a *326 speedy trial, and (4) prejudice to the defendant resulting from the delay. Id. at 530, 92 S.Ct. 2182.
¶ 17. The court used the date of Travis’s arraignment, August 2, 2004, as the beginning date for its analysis. The court found that the time from August 2, 2004, to November 16, 2004, the date originally set for trial, should not count against the State because the trial date was set during the arraignment without objection from Travis’s then-retained counsel. The court said that on September 9, 2004, after Travis had the Hinds County Public Defender’s Office appointed as his counsel, the public defender moved for the case to be reset for May 19, 2005. Considering this, the trial judge found that the time between September 9, 2004, until May 19, 2005, should not be counted against the State as the delay was a result of a request' from the defense. The court said that the next event was Travis’s filing of his pro se motion for dismissal on January 18, 2005. The trial judge noted his previous ruling that the motion was abandoned pursuant to URCCC 2.04, but he found that even if the motion had been heard, it would have been denied as the entire delay was charged against the defendant. The trial court noted that Travis was released on bail on January 26, 2005, the day after his motion to set/reduce bond was heard.
¶ 18. The next event referenced by the trial judge was November 22, 2005, when the case was reset for trial to begin on February 22, 2006. The court took judicial notice of its docket during that time frame and stated that the reason for the delay was the court’s crowded docket. The judge said that the trial of other cases prohibited Travis from going to trial on February 22 and that on February 22, 2006, he was trying one of many “so-called gang related cases” involving multiple defendants. The judge held that the reason for the delay for the period from February 22, 2006, to the date of the actual trial, August 9, 2006, was caused by the crowded court docket.
¶ 19. The trial court found that Travis had not asserted his right to a speedy trial and that fact mitigated against him. “While it is true that a defendant does not have the responsibility to bring himself to trial, the appellate courts have consistently ruled that the lack of a request or demand or assertion of the right to a speedy trial is a factor to be weighted against the defendant or at least it mitigates against the delay that might otherwise be charged to the State,” the judge said.
¶ 20. Considering the fourth factor of the Barker analysis — prejudice to a defendant due to the delay — the trial court found that two things were presented by Travis as prejudice. The first was Travis’s testimony that he was unable to drive' a truck out of the state which adversely affected his ability to earn a living as a truck driver. The trial judge said that he had reviewed the order setting conditional bond, and there was no such condition in the bond order that provided that the defendant could not leave the state. Therefore, he found no prejudice as to this matter. The second claimed prejudice was that two alibi witnesses, Odell Harris and a Mr. Booker[3] both of the New Orleans area, had died prior to trial. The judge said that his review of the court file showed that no subpoenas were ever issued for the two men, nor had their names been provided to the State prior to trial. The judge said that subpoenas were not the only way to have witnesses appear at trial. However, the judge stated that he could only find that this was done to gain a tactical advantage. In that event, the *327 judge found that even if the witnesses were at the trial that day, they would not be allowed to testify under the rules of reciprocal discovery. Thus, the trial court ruled there was no prejudice to Travis on this issue.
¶ 21. Allegations of speedy trial violations are examined and determined on a case-by-case basis looking at the facts of each case. Sharp v. State, 786 So.2d 372, 377(¶ 4) (Miss.2001). A criminal defendant’s constitutional right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution. This right attaches, and the time begins to run, upon the defendant’s arrest. Black v. State, 724 So.2d 996, 1001(¶ 14) (Miss.Ct.App.1998). The Sixth Amendment to the United States Constitution entitled Travis to a “speedy and public trial.” U.S. Const. amend. VI. The United States Supreme Court has observed that “the right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment. That right has its roots at the very foundation of our English law heritage.” Klopfer v. North Carolina, 386 U.S. 213, 223, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). The constitutional right is applied to the states through the Fourteenth Amendment. Id. at 222-23, 87 S.Ct. 988. The Supreme Court has observed that the speedy trial right serves a threefold purpose: (1) to protect the accused against oppressive pretrial imprisonment, (2) to minimize the accused’s anxiety and public suspicion due to the unresolved criminal charge, and (3) to limit the possibility of a long delay that will impair the defendant’s ability to defend himself. United States v. Loud Hawk, 474 U.S. 302, 312, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986) (citing United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966)). Thus, the protection given by the right to a speedy trial is against arbitrary and oppressive delays in prosecution.
¶ 22. The length of the delay is a triggering mechanism in that until there is some delay which is presumptively prejudicial, there is no necessity to inquire about the other Barker factors. Murray v. State, 967 So.2d 1222, 1230(¶ 23) (Miss. 2007). The supreme court has held that any delay of eight months or longer is presumptively prejudicial. Id. We find that the time between the arrest of Travis on August 13, 2003, and his trial on August 9, 2006, was a period of nearly thirty-six months and, thus, was presumptively prejudicial. When the constitutional right attaches, we are required to apply the balancing test set out in Barker to determine if the speedy trial right has been denied.
¶ 23. The Mississippi Constitution also guarantees a criminal defendant the right to a speedy trial which attaches at the time of arrest. Miss. Const. Art. 3, § 26. The State is statutorily required to bring a defendant to trial within 270 days of arraignment “[u]nless good cause [can] be shown, and a continuance duly granted by the court.” Miss.Code Ann. § 99-17-1 (Rev.2007). Unlike the constitutional right, which attaches at arrest, the state statutory right attaches at arraignment. Id. The time between the arraignment of Travis on August 2, 2004, and his trial on August 9, 2006, was a period of twenty-four months and, thus, was presumptively prejudicial. Since each requires an application of the Barker factors, we will examine the state and federal rights together.
¶ 24. The State bears the burden of proving good cause for the speedy trial delay and, thus, bears the risk of non-persuasion. Flores v. State, 574 So.2d 1314, 1318 (Miss.1990). Good cause is a factual finding that is not different from any other finding of fact; thus, an appellate court should not disturb the finding of *328 fact when it is based upon substantial evidence identified from the record. McGhee v. State, 657 So.2d 799, 803 (Miss.1995).
¶ 25. The trial court did not perform an analysis for a violation of Travis’s constitutional right to a speedy trial. We reach this conclusion because the trial judge began his analysis with the date of the arraignment as required under the state statute and not by using the date of arrest as required by the federal and state constitutions. Thus, the court did not review or determine the reasons for the delay in bringing Travis to trial from the date of his arrest, August 13, 2003, to the date of arraignment, August 2, 2004, a period of almost one year. During the pretrial hearing on the motion for speedy trial, neither Travis’s counsel nor the prosecutor directly addressed the constitutional speedy trial rights. Travis’s counsel brought to the court’s attention the fact that the incident happened in May 2003 and that Travis turned himself in in August 2003. Then “for whatever reason” Travis was not brought before a grand jury until the March 2004 term — resulting in an indictment filed on June 8, 2004. In the appellant’s brief and the reply brief, the attorney for Travis notes that this time was not allocated by the trial court and argues that under the authority of Jenkins v. State, 607 So.2d 1137, 1139 (Miss.1992), the time should be counted against the State. The State does not address this point in its appellee’s brief.[4]
¶ 26. We must agree with Travis. The responsibility to bring a defendant to trial is upon the State, since a defendant has no duty to bring himself to trial. Id. Where the record is silent regarding the reason for the delay, then the time is counted against the State because the State bears the risk of non-persuasion on the good cause issue. Vickery v. State, 535 So.2d 1371, 1375 (Miss.1988). Since the State bears the burden of proving good cause for the nearly one-year delay and the record is silent as to the cause for the delay, we find that this time weighs against the State. Because the time period is more than eight months in length, we find that it is presumptively prejudicial. However, our analysis does not stop here. Once there is a finding that the delay is presumptively prejudicial, the burden shifts to the State to produce evidence justifying the delay and to persuade the trial court of the legitimacy of these reasons. DeLoach v. State, 722 So.2d 512, 517(¶ 17) (Miss.1998). We must look at the whole period between Travis’s arrest and his trial and then “engage in a difficult and sensitive balancing process.” Barker, 407 U.S. at 533, 92 S.Ct. 2182.
¶ 27. The accused’s assertion of or failure to assert the right to a speedy trial is one of the factors to be considered in an inquiry of whether the speedy trial right was denied. Although a defendant does not have an obligation to bring himself to trial, he will earn points on his side of the ledger when he has made a demand for a speedy trial. Stevens v. State, 808 So.2d 908, 917(¶ 22) (Miss.2000). Travis claims that he asserted his right to a speedy trial by filing the motion for dismissal on January 13, 2005. In Summers v. State, 914 So.2d 245, 253(¶ 20) (Miss.Ct.App.2005), this Court held that a demand for dismissal for violation of the right to a speedy trial is not the same as a demand for a *329 speedy trial. In Perry v. State, 637 So.2d 871, 875 (Miss.1994), the court said that the motion to dismiss seeks discharge of the defendant, not a speedy trial for him. We are not allowed, therefore, to count in Travis’s favor his pretrial motion seeking dismissal of the charges. We find that Travis did not request a speedy trial, but instead he asked that the charges be dismissed against him because of an alleged lack of speedy trial. Thus, this factor weighs in favor of the State.
¶ 28. When we examine the time from arraignment to trial in this case, we find that the trial court’s analysis and findings regarding the other reasons for delay are supported by substantial evidence. Beginning with the date of Travis’s arraignment, August 2, 2004, until the date originally set for trial November 16, 2004, the trial court found that the time should count against Travis since his counsel had not objected to the trial date. Likewise, we agree that the time from September 9, 2004, until May 19, 2005, should be counted against Travis since his defense counsel requested the delay. The rest of the time until the actual date of the trial the trial court found to be due to an overcrowded docket and weighed this slightly against the State. The trial court noted for the record his and the other trial judges’ crowded trial calendars. We have held that delays due to crowded dockets are not weighed heavily against the State. Skaggs v. State, 676 So.2d 897, 901 (Miss.1996). While lamentable, it is nonetheless true that courts in the more populated areas of our state maintain a criminal docket which is so large that delay in bringing defendants to trial is a rueful byproduct.
¶ 29. The final Barker factor is prejudice to the defendant. On this point, Travis makes two claims of prejudice. The first is that he was unable to make a living when he was released on bond because he was not allowed by the bond to drive out of state. The trial court examined the bond and found no provision which kept Travis from pursuing his occupation as a truck driver. The bond was made a part of the record and is substantial evidence to support the trial judge’s decision. Travis’s second claim of prejudice is that two alibi witnesses died prior to trial. The alleged witnesses were Harris and Booker, both of the New Orleans area, who both died during the first part of 2006. The trial court noted that the record contained no subpoena for these witnesses although the judge said subpoenas would not be required for witnesses to attend. The court also noted that the names of the witnesses were never provided to the prosecution “in spite of the fact that, according to the defendant, they showed up several times when the case was set for trial.” The court found that the defendant’s failure to supply the names was done to gain a tactical advantage and, thus, was a violation of reciprocal discovery rules. “[E]ven if the witnesses were here to testify today, they would not be allowed to testify under the rules of reciprocal discovery,” the trial judge said.
¶ 30. Rule 9.04 of the Uniform Rules of Circuit and County Court imposes upon a defendant requesting discovery a reciprocal duty to disclose to the prosecution the names and addresses of any trial witness. URCCC 9.04(C)(1). The rule allows a trial judge who finds that witnesses have not been disclosed to take certain actions including to “enter such other order as it deems just under the circumstances.” URCCC 9.04(1). Exclusion of evidence for a discovery violation is an extreme sanction and is only appropriate where the defendant’s discovery violation was willful and motivated by a desire to obtain a tactical advantage. Ross v. State, 954 So.2d 968, 1000(¶ 65) (Miss.2007). The first time that either the State or the trial court heard of the witnesses, Harris and *330 Booker, was on the day of the trial. There were two motions for discovery, one filed by Travis’s retained counsel on June 30, 2004, and the other by the public defender’s office on September 9, 2004. Therefore, Travis incurred an obligation to provide reciprocal discovery.
¶ 31. We find there was substantial evidence to support the trial court’s finding that Travis’s failure was a violation of reciprocal discovery, and these witnesses should have been excluded.
¶ 32. When we apply the Barker test and consider all of the balancing factors, we find that the nearly one-year delay is charged to the State, while the remainder of time until trial is either weighed against the defendant or not weighed heavily against the State. We find no error in the trial court’s determination that Travis did not suffer undue prejudice. Based upon these facts, we find that there was substantial evidence to support the trial court’s decision that Travis’s constitutional and statutory speedy trial rights were not violated. Thus, we find no merit in this alleged error.
II. WHETHER THE TRIAL COURT ERRED IN DENYING TRAVIS’S MOTION FOR A NEW TRIAL AND MOTION FOR A JUDGMENT NOTWITHSTANDING THE VERDICT.
A. New Trial
¶ 33. Travis argues that his conviction hinges on tenuous evidence and virtually no direct evidence. He claims that although Hines explicitly described his kidnaping and the burglary of his home, he was unable to identify Travis as the one who was involved. Travis also minimizes the testimony of his young cousin, Jones, pointing to inconsistencies in his testimony.
¶ 34. Travis entreats us to sit as the thirteenth juror and find that allowing Travis’s conviction to stand would sanction an unconscionable injustice. Dilworth v. State, 909 So.2d 731, 737-38 (¶¶ 21-23) (Miss.2005).
¶ 35. A motion for a new trial challenges the weight of the evidence, and a reversal is warranted only if the trial court abused its discretion in denying the motion for a new trial. Id. at 737(¶ 20). It is only in the exceptional case where the evidence preponderates heavily against the verdict that the trial court should invade the province of the jury and grant a new trial. Hodgin v. State, 964 So.2d 492, 497(¶22) (Miss.2007). The verdict must be “so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Dilworth, 909 So.2d at 737(¶ 21) (citation omitted).
¶ 36. It is true that while Hines’s testimony detailed his brutal kidnaping and the burglary of his apartment, he was unable to identify his assailants. However, Hines’s testimony regarding Travis’s motive for the crime was clearly set out. Hines testified that as the apartment manager he had been having trouble with Travis refusing to pay his rent. Travis ignored numerous notes from Hines to pay. Hines determined he had to evict Travis. Hines testified that he gave Travis a final notice at the end of one week, and the home invasion happened shortly thereafter.
¶ 37. As to other evidence which pointed to Travis’s guilt, there was the extensive testimony of Jones who testified that he saw Travis and another man push into Hines’s apartment with guns and then bring two people out with their hands bound and eyes blindfolded. He said he saw Travis and the other man put the male and female victims in the truck in which *331 Jones had been sitting and drive off. Jones said he got out of the truck and did not leave with the group. He said that after the woman was brought back to the apartment, he heard Travis tell her he would not hurt her if she cooperated. Jones testified that Travis brought four laundry bags full of items from the apartment and placed them in the back of the truck. Addition items taken from the apartment were also found in an automobile belonging to Travis. Detective Den-son testified that during the investigation he looked into the automobile and saw a dark-colored ski mask. After securing a search warrant for the automobile, the police found the keys to all of the apartments, Watson’s keys, and a set of crystal-all items which Hines and Watson identified as theirs. Thus, we find that the trial judge did not abuse his discretion when he overruled the motion for a new trial. This issue is without merit.
B. Judgment Notwithstanding the Verdict
¶ 38. The crime for which Travis was found guilty, burglary of an inhabited dwelling, is found in Mississippi Code Annotated section 97-17-23 (rev.2006). At the time of his indictment the statute read as follows:
Every person who shall be convicted of breaking and entering the dwelling house or inner door of such dwelling house of another, whether armed with a deadly weapon or not, and whether there shall be at the time some human being in such dwelling house or not, with intent to commit some crime therein, shall be punished by imprisonment in the Penitentiary not less than three (3) years nor more than twenty-five (25) years.
Miss.Code Ann. § 97-17-23.[5]
¶ 39. A motion for a directed verdict or a JNOV attacks the legal sufficiency of the evidence. McClain v. State, 625 So.2d 774, 778 (Miss.1993). In considering the sufficiency, we view the evidence in the light most favorable to the prosecution. Bush v. State, 895 So.2d 836, 843(¶ 16) (Miss. 2005). We must reverse and render if the facts and inferences “point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty.” Id. However, the evidence will be found sufficient if reasonable jurors, applying the beyond a reasonable doubt standard, might reach different conclusions on each element of the offense. Id. (citing Edwards v. State, 469 So.2d 68, 70 (Miss.1985)). Another salient rule is that it is the jury not the trial court or this Court which is charged with assessing the weight and credibility of the evidence and with resolving conflicts in the evidence. Latiker v. State, 918 So.2d 68, 73(¶ 12) (Miss.2005).
¶ 40. We find that in viewing the evidence in the light most favorable to the State that there was sufficient evidence to support Travis’s guilt of house burglary. Jones testified that he saw Travis and another man push their way into Hines’s apartment with guns and then lead a man and woman whose hands were tied and their eyes covered out of the apartment and then take the two victims away. Travis was at odds with Hines because Hines was about to evict him for not paying his rent. Jones testified that he saw Travis put four laundry bags full of items from the apartment into the back of a truck Travis was driving. Further, the police detective *332 found items from the apartment and a ski mask in a car belonging to Travis that was parked at the scene of the crime. This evidence meets every element of the crime of house burglary. Therefore, we find that this issue is without merit.
¶ 41. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY OF CONVICTION OF BURGLARY OF A DWELLING AND SENTENCE OF TWENTY-FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH TEN YEARS SUSPENDED AND FIVE YEARS OF SUPERVISED PROBATION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.

. Initially Travis was represented by retained counsel, but when his mother could no longer pay the lawyer, the attorney was allowed to withdraw as counsel. The Hinds County Public Defender's Office was appointed to represent Travis, but the motion at issue was filed by him pro se.

. "It is the duty of the movant, when a motion or other pleading is filed ... to pursue said motion to hearing and decision by the court. Failure to pursue a pretrial motion to hearing and decision before trial is deemed an abandonment of that motion." URCCC 2.04.

. No first name was supplied for Mr. Booker.

. The State argues in its appellee’s brief that the only issue before the Court is an alleged violation of Travis's constitutional right to a speedy trial. The State argues that Travis is procedurally barred from arguing a violation of his state statutory right as he did not raise that issue at the trial level. We disagree with the State in that the only speedy trial right that was examined by the trial court was the state statutory right.

. Section 97-17-23 was amended in 2008, effective July 1, 2008. 2008 Miss. Laws chapter 307 § 1. The amendment is not relevant for our discussion.