# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-KA-00331-COA

ALVIN BROWN                                                      APPELLANT

v.

STATE OF MISSISSIPPI                                            APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 02/05/2014 |
| TRIAL JUDGE: | HON. WILLIAM A. GOWAN JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LISA L. BLOUNT |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF MANSLAUGHTER AND FOUR COUNTS OF AGGRAVATED ASSAULT AND SENTENCED TO TWENTY YEARS FOR MANSLAUGHTER AND TEN YEARS FOR EACH COUNT OF AGGRAVATED ASSAULT, WITH THE AGGRAVATED-ASSAULT SENTENCES TO RUN CONCURRENTLY WITH ONE ANOTHER AND CONSECUTIVELY TO THE MANSLAUGHTER SENTENCE, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED IN PART, AND REVERSED AND REMANDED IN PART - 06/28/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., BARNES AND ISHEE, JJ.**

**ISHEE, J., FOR THE COURT**:

¶1.     A Hinds County Circuit Court jury convicted Alvin Brown of manslaughter and four counts of aggravated assault. The trial court sentenced Brown to twenty years for the manslaughter conviction and ten years for each aggravated-assault conviction, all in the custody of the Mississippi Department of Corrections (MDOC). The aggravated-assault sentences were ordered to run concurrently with each other, and consecutivly to the manslaughter sentence. Brown appeals his convictions and sentences, raising the following issues: (1) the trial court erred in denying his motion to dismiss for a violation of his right to have a speedy trial; (2) the trial court erred in giving an "imperfect" self-defense manslaughter jury instruction; (3) the evidence was insufficient to support a manslaughter conviction or any of the four aggravated-assault convictions; (4) the jury was not instructed properly on the aggravated-assault charges; (5) the trial court erred in admitting a weapon as evidence; and (6) Brown was subjected to double jeopardy.

¶2.     For the following reasons, we affirm in part and reverse and remand in part.

### FACTS

¶3.     On the night of September 20, 2009, a shooting occurred at the Birdland night club in Jackson, Mississippi. During a confrontation between Brown and Albert Coleman, Yatasha Johnson was shot and killed. Latonya Hopson King, Malcolm Smoot, Derrick Walker, and Anastasia Murdock were all shot and wounded.

¶4.     At trial, Brown testified in his own defense and stated that he was nineteen at the time of the incident. He explained that he and his cousin, Smoot, went out on the night in question to look for women and decided to go to Birdland. They arrived at the crowded club

2

sometime between 11 p.m. and midnight. At the entrance, they went through two pat-downs performed by security guards and then through a metal detector. According to Brown, he was standing near the club's bar when Eddwantya Epps approached him. Brown bought Epps a drink. Coleman soon approached Epps, but Brown did not recognize him. According to Brown, Coleman was talking to Epps as if he were angry with her and pointing his fingers at her.

¶5.    At trial, Brown explained that "he didn't want any trouble," but when he turned to walk away, Coleman grabbed Brown and hit him. They began fighting. Brown testified that he saw Coleman reach down into his pants and retrieve a gun. According to Brown, he struggled with Coleman and tried to keep the gun away from himself as shots were being fired. Brown explained he believed that in order to win the fight against Coleman he had to stay close to him, so Brown used his left hand to hold Coleman's shirt and his right hand to defend himself. Brown did not recall anything else about the incident. He testified that he woke up in the hospital seven or eight days later. Brown denied having a gun in Birdland and claimed he did not own a weapon.

¶6.    Coleman, at the time of trial, was forty-five years old, and admitted to knowing Brown as a "kid" from the "neighborhood." Coleman testified that when he arrived at the club, he went to shake Brown's hand, but Brown yelled at him. According to Coleman, Brown walked away but returned a few minutes later to confront Coleman. Coleman testified that he punched Brown, and then, immediately after, Coleman heard a gunshot. He looked down and saw that Brown had a gun. Coleman testified that he grabbed Brown's

3

wrist to control the gun, but Brown kept shooting. Coleman stated that he was able to wrestle the gun away from Brown and eventually placed it on the bar.

¶7.    Coleman testified that seeing Johnson lying on the floor of the club after she was shot was "too much," so he left the club. Coleman left alone, got in his car, collected his things from his hotel room, and drove home to Little Rock, Arkansas. Coleman claimed that he did not feel safe coming back to Jackson, Mississippi, to give a statement, so he gave a statement to a police officer in Little Rock the next day. Eventually, Coleman talked to the Jackson Police Department. According to Coleman, he did not own a gun because he is a convicted felon.

¶8.    Several witnesses who were at Birdland that night testified at trial. King testified that she and a friend were walking from the restroom back to the bar area when she noticed the fight, so she headed back to the restroom for safety. As she turned to go back, she was shot but did not realize it until she was back in the restroom. King stayed in the restroom and waited for an ambulance. She testified that she never saw who was fighting, nor did she see the shooter or the gun.

¶9.    Murdock was exiting the restroom when the shooting began. She was shot in both legs. However, at trial, she testified that she did not see where the shots came from and never saw a fight or scuffle.

¶10.   Walker, one of the security guards working the night of the incident, testified that he was in front of the disc-jockey booth when the shooting started. He stated that he could see "commotion" between Brown and Coleman. Walker testified that he saw Coleman hit

4

Brown, and then he heard five gunshots. Walker was shot in the left thigh. However, Walker testified that he did not see the gun. He described seeing several others shot and one "girl laid out." He also saw Brown "laid out" and patrons at the bar throwing stuff at Brown.

¶11. JPD Officer Lateef Skinner testified that he responded to the shooting at Birdland. Officer Skinner found Smoot bleeding with what appeared to be a gunshot wound to the abdomen. He escorted Smoot to the hospital.

¶12. Ebony Brown, a regular patron at the club also testified. Just before the shooting, she stated she could see "tussling," but before the security guards could get to the fight to break it up the shooting started. She testified that she never saw the gun and never saw who fired the shots. Ebony also stated everyone hit the floor when the shooting began and then fled the club afterwards. Ebony testified that there was tight security at the club, including metal detectors, pat-downs, and handbag searches.

¶13. Marques White was tending the bar that night, and testified that he saw Brown and Coleman arguing. Marques saw the scuffle but did not see the gun. According to Marques, Coleman was a much taller and larger person than Brown, and when he saw them struggling, he saw Brown fighting in a low position. Marques admitted that he could not see whether Coleman had his hand on top of Brown's or whether Brown's hand was on top. He also admitted that he could not see the gun or who initially pulled out the gun. After the shooting stopped, Coleman tried to give Marques the gun, but Marques told him to put it on the counter, which Coleman did.

¶14. Shun White, whose father owned and operated Birdland, testified that he was working

5

at the club on the night of the incident. Shun stated that he had known Coleman for over twenty years, but had never seen Brown before that night. Shun did not see any of the confrontation between the two men or the gun. After the shooting stopped, he saw Coleman put a gun on the bar top. Shun testified that Coleman told him that he had just taken the gun away from somebody.

¶15.    John Greer, the disc jockey at the club on the night of the incident, also testified at trial. He stated that he had on headphones and did not hear the gunshots. Greer explained that when he looked up, he saw everybody on the floor except for Brown and Coleman, who were struggling for a gun. He did not see who initially pulled the weapon.

¶16.    Epps testified that she arrived at Birdland with a friend between 12:30 and 1:00 a.m. She explained that she was standing at a table when she saw Coleman and Brown begin to argue. She testified that before the men started to fight, she was standing close enough to Brown to see that he had a gun at his side and commented about it to her friend. Epps saw the men struggle before the first shot was fired. She said she heard Coleman yell for the crowd to "get him," meaning Brown. According to Epps, people in the club started beating and kicking Brown because he had the gun. Epps testified that the only time she saw Coleman with a gun was when he placed it on the bar.

¶17.    Officer Lakeith Williams with the Jackson Police Department, one of the first to respond to the scene, did not notice any gunshot wounds to Brown, who was unconscious and bleeding heavily when police arrived. Officer Derrick Archie testified that when he arrived, the heel of a woman's stiletto was sticking out of the back of Brown's head. Brown was

taken to University of Mississippi Medical Center (UMMC). Garland Ward, a detective assigned to the case, went to UMMC to collect samples from Brown for a gunshot-residue test. Jacob Burchfield, an expert gunshot-residue analyst, testified that the identification of gunshot residue on a sample from a person means that the person was in the environment of a discharged weapon, which would mean that the person fired the weapon; or the person handled something with gunshot residue on its surface, such as a weapon; or the person was in close proximity at the time the weapon was discharged. Burchfield testified to his analysis of swabs from the back and palm of Brown's hands. Brown's right palm and the back of his left hand tested positive for gunshot residue.

¶18. Brown was indicted for one count of depraved-heart murder and four counts of aggravated assault. The jury convicted Brown of manslaughter and four counts of aggravated assault. The trial court sentenced Brown to twenty years for the manslaughter conviction and ten years for each aggravated-assault conviction, with the aggravated-assault sentences to run concurrently with each other, and consecutively to the manslaughter sentence, all in the custody of MDOC. Aggrieved, Brown appeals.

**DISCUSSION**

I.     **Speedy Trial**

¶19. On appeal, Brown's first argument is that the trial court erred in denying his motion to dismiss for violation of his constitutional and statutory rights to a speedy trial. Brown was taken into custody upon being released from UMMC on September 30, 2009. He was indicted on December 9, 2009, and was arraigned two months later. His first trial started on

August 19, 2013, and ended in a mistrial three days later. His second trial, the subject of this appeal, began on January 21, 2014.

¶20.    Mississippi Code Annotated section 99-17-1 (Rev. 2015) grants a defendant the right to a speedy trial. This statutory right provides that an accused shall be tried within 270 days of his arraignment. Miss. Code Ann. § 99-17-1. Furthermore, in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), the United States Supreme Court created a four-factor test, which Mississippi courts later adopted to determine whether a defendant's constitutional right to a speedy trial had been violated. The factors are "[the] [l]ength of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker*, 407 U.S. at 530.

¶21.    Upon hearing and considering the motion, the trial court ruled that Brown's right to a speedy trial had not been violated because a demand for speedy trial was not filed until "well after" 270 days. However, the trial court expressed its concern with protecting Brown's constitutional right and specifically found that a *Barker* analysis was warranted, "as the first trial date was not even set within eight (8) months of [the] indictment, which occurred prior to arrest, meaning a presumption of prejudice ha[d] arisen."

¶22.    The trial court agreed with the timeline provided by the defense, and found "that from the time of indictment to the time of the . . . August 19, 2013 trial date, a total of one thousand one hundred and sixty three (1163) days must be counted against the State, . . . although not heavily." The trial court went on to state that perhaps the most important factor to review is the actual prejudice to the defendant. In that vein, it noted:

8

> This trial court has considered the lengthy pre-trial incarceration and [Brown's] anxiety associated with awaiting trial. However, the Mississippi Supreme Court and this Court's main concern is potential loss of evidence. . . . Having considered all factors and the totality of the circumstances, including the nature of the charges, the [c]ourt is not inclined at this point to grant the motion to dismiss.

At the time, neither the State nor the defense was able to locate Coleman, but the State indicated that it was close to finding him. The trial court ordered the State to locate Coleman within a week and to notify Brown's counsel when Coleman was located. The trial court also noted that "[b]y the end of the year this indictment will be four (4) years old."

¶23. Despite beginning Brown's initial trial on August 19, 2013, a mistrial was ordered on the fourth day of trial. A new trial date was set, but the record reveals that there were two continuances. One continuance was agreed to by both parties due to the State's attorneys having the flu and the lack of a witness. Another time, the trial court sua sponte continued the second trial as a result of a backlog on the docket. The supreme court has held that "[d]elays caused by overcrowded dockets are not to be weighed heavily against the State." *State v. Magnusen*, 646 So. 2d 1275, 1282 (Miss. 1994) (citation omitted). In *Travis v. State*, 13 So. 3d 320 (Miss. Ct. App. 2008), nearly three years passed from arrest to trial, and the delay was due, in part, to the crowded docket. *Id.* at 326-27 (¶¶18, 22). This Court held that Travis did not suffer prejudice and that his right to a speedy trial was not violated. *Id.*

¶24. In *Russell v. State*, 79 So. 3d 529, 535 (¶13) (Miss. Ct. App. 2011), we explained:

> Review of a speedy-trial claim involves a question of fact: whether the trial delay arose from good cause. We will uphold the trial court's finding of good cause if that decision is supported by substantial, credible evidence. However, if no probative evidence supports the trial court's findings, we must reverse the decision and dismiss the charge. The State bears the burden of proving good

9

> cause for the speedy trial delay, and thus bears the risk of non-persuasion. Good cause is a factual finding which is not different from any other finding of fact, and thus, an appellate court should not disturb the finding when it is based upon substantial evidence identified from the record. We will affirm a trial court's findings where they are supported by substantial, credible evidence.

(Internal citations omitted).

¶25. Brown clearly asserted his right to a speedy trial and filed motions both pro se and through his counsel. Although he failed to timely avail himself of the statutory right to a speedy trial, he clearly invoked an analysis of his constitutional right. The length of the delay, one of the *Barker* factors, clearly favors Brown, as there is no dispute that there was a lengthy delay of more than three years between Brown's arrest and the date of his first trial. However, the trial court found good reason for the delay. The record reveals that there were a number of continuances that could be charged to both the State and Brown, including: an initial belief that Brown's case could be settled; a reassignment of judges; the inability of locating a witness crucial to the defense; another witness crucial to the prosecution was on active duty and deployed overseas and did not return in time for one of the trial dates; the trial was twice continued due to an overcrowding of the docket; there was a lack of notice to prepare for a motion; and several joint motions to continue.

¶26. As noted by the trial court, another *Barker* factor requires consideration of prejudice to the defendant. Brown claims to have suffered anxiety as a result of this long pretrial process. However, this factor was addressed mainly through Brown's counsel and not by medical evidence or records from jail. As for his ability to provide a defense, Brown was able to secure testimony from his witnesses despite the long delay. After a review of the

10

record, we agree with the trial court's analysis of the *Barker* factors, and find that the trial court's decision is supported by substantial and credible evidence. Therefore, this argument is without merit.

## II.     Imperfect-Self-Defense Jury Instruction

¶27.    Brown contends the trial court erred by instructing the jury on "imperfect" self-defense. Specifically, Brown argues that there was no evidentiary basis for giving the imperfect-self-defense manslaughter instruction in this case. The instruction at issue, S-10, read:

> The [c]ourt instructs the [j]ury that if you unanimously find that the State has failed to prove all the elements of the crime of [m]urder, you may then proceed in your deliberations to consider the lesser charge of [m]anslaughter. However, it is your duty to accept the law given to you by the [c]ourt; and if the facts and the law warrant a conviction of the crime of [m]urder, then it is your duty to make such finding, and not be influenced by your power to find a lesser offense. This provision is not designed to relieve you[] from the performance of an unpleasant duty. It is included to prevent a failure of justice if the evidence fails to prove the original charge but does justify a verdict for the lesser crime. The [c]ourt instructs the [j]ury that if a person kills another under the actual bona fide[] belief that such a killing is necessary in order to protect himself from great bodily harm or death, but that such belief is not reasonable under the circumstances, then there is no malice aforethought and the killing is not murder, but at most is the crime of manslaughter.

¶28.    Brown was indicted for murder. An indictment for murder encompasses the lesser-included charge of manslaughter. *State v. Shaw*, 880 So. 2d 296, 304 (¶26) (Miss. 2004). If the record shows any evidence that can support a lesser offense, then the circuit court should give the lesser-offense instruction. *See Ormond v. State*, 599 So. 2d 951, 961 (Miss. 1992); *Mease v. State*, 539 So. 2d 1324, 1329-30 (Miss. 1989).

¶29.    Here, the record is clear that Coleman was the initial aggressor and threw the first

11

punch. Witnesses all agreed that Coleman was the larger and older of the two. Brown admitted that he had to defend himself after Coleman had "grabbed" him. Brown maintained his theory of defense that he did not produce a gun at the club and did not shoot the gun. Brown now argues that no testimony was offered to show that Brown acted in self-defense. However, the evidence supports the theory that after Coleman attacked Brown, Brown may have shot the gun with the intent to protect himself. Furthermore, the jury chose to believe that Brown had the gun, and they further believed that Brown had to kill to protect himself, even if that belief was not reasonable under the circumstances. Given the evidence presented to the jury supporting a possible manslaughter offense, we find that the trial court did not err in giving the imperfect-self-defense instruction to the jury.

### III.    Sufficiency of the Evidence

¶30.    In reviewing the sufficiency of the evidence, the standard of review is quite limited. "[A]ll evidence supporting the guilty verdict is accepted as true, and the State must be given the benefit of all reasonable inferences that can be reasonably drawn from the evidence." *Reed v. State*, 956 So. 2d 1110, 1111 (¶6) (Miss. Ct. App. 2007) (citing *Bell v. State*, 910 So. 2d 640, 646 (¶16) (Miss. Ct. App. 2005)). "Furthermore, it is well-settled law that the jury determines the credibility of witnesses and resolves conflicts in the evidence." *Id.* (citing *Evans v. State*, 725 So. 2d 613, 680-81 (¶293) (Miss. 1997)). "All of the evidence is to be considered in the light most consistent with the verdict." *Id.* "The prosecution is given the benefit of all favorable inferences that may reasonably be drawn from the evidence." *Id.*

¶31.    The record reveals that several witnesses testified to seeing Brown with the gun. It

was undisputed that Coleman attacked Brown. Epps testified that she could see Brown had a gun. Brown's right palm and the back of his left hand tested positive for gunshot residue. Here, the jury found the testimony of the State's witnesses to be more credible and resolved any minor inconsistencies in the evidence in favor of the State. The evidence is sufficient and clearly supports the guilty verdict. We find no merit to this issue.

## IV. Aggravated-Assault Indictment and Jury Instructions

¶32. Brown argues that the jury was not properly instructed regarding the essential elements of aggravated assault, specifically that Brown caused "serious bodily injury." The language in the indictment charging Brown with four counts of aggravated assault stated that Brown:

> Did willfully, unlawfully and feloniously cause *serious bodily injury* to Anastasia Murdock to wit: by shooting her in her legs purposely, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life. In the First Judicial District of Hinds County, Mississippi, in violation of Section 97-3-7(2)(a). . . .

> Did willfully, unlawfully and feloniously cause *serious bodily injury* to Malcolm Smoot to wit: by shooting him in the groin areas of his body purposely, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life. In the First Judicial District of Hinds County, Mississippi, in violation of Section 97-3-7(2)(a). . . .

> Did willfully, unlawfully and feloniously cause *serious bodily injury* to Latonya King Hopson to wit: by shooting her in the buttocks purposely, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life. In the First Judicial District of Hinds County, Mississippi, in violation of Section 97-3-7(2)(a). . . .

> Did willfully, unlawfully and feloniously cause *serious bodily injury* to Derrick Walker to wit: by shooting him in the leg purposely, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life. In the First Judicial District of Hinds County, Mississippi, in

13

violation of Section 97-3-7(2)(a). . . .

(Emphasis added).

¶33. At the time Brown was indicted, Mississippi Code Annotated section 97-3-7(2) (Rev.

2006) stated:

> A person is guilty of aggravated assault if he **(a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under the circumstances manifesting extreme indifference to the value of human life**; or (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm . . . .

(Emphasis added).

¶34. At trial, jury instruction S5 read:

> If you find from the evidence in this case beyond a reasonable doubt that:
>
> 1. The defendant, Alvin Brown;
>
> 2. On or about September 20, 2009;
>
> 3. In the First Judicial District of Hinds County, Mississippi;
>
> 4. Did purposefully or knowingly cause or attempt to cause **bodily injury** to Anastasia Murdock;
>
> 5. with a firearm, a deadly weapon;
>
> then you shall find the defendant guilty of aggravated assault.
>
> If the prosecution has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find the defendant not guilty of aggravated assault.
>
> If Alvin Brown did purposely or knowingly cause bodily injury to Anastasia Murdock with a firearm, a deadly weapon, then you shall find the defendant guilty of aggravated assault.

14

(Emphasis added). Instructions S6 through S8 were substantively identical to S5, but provided the other three names of the victims who were shot that night.

¶35.    At the outset, we note that Brown failed to make an objection regarding the discrepancy at trial. Nonetheless, the issue is not procedurally barred. Serious bodily injury is an essential element of the crime of aggravated assault. *See Snowden v. State*, 131 So. 3d 1251, 1256 (¶16) (Miss. Ct. App. 2014). Failure to instruct the jury as to an essential element of the crime is reversible error. *Bolton v. State*, 113 So. 3d 542, 544 (¶4) (Miss. 2013). "Due[-]process rights include the right to a properly instructed jury." *Blunt v. State*, 55 So. 3d 207, 211 (¶16) (Miss. Ct. App. 2011) (citing *Shaffer v. State*, 740 So. 2d 273, 282 (¶31) (Miss. 1998)).

¶36.    Furthermore, the circuit court is responsible for assuring that the jury is "fully and properly instructed on all issues of law relevant to the case." *Harrell v. State*, 134 So. 3d 266, 270 (¶14) (Miss. 2014) (quotation omitted). The trial court is ultimately responsible for rendering proper guidance to the jury via appropriately given jury instructions, even sua sponte. *See Hunter v. State*, 684 So. 2d 625, 636 (Miss. 1996) (stating that "[i]t is rudimentary that the jury must be instructed regarding the elements of the crime with which the defendant is charged[,] . . . [and] even though the defendant did not present an acceptable instruction, the State was obligated to do so").

¶37.    In *Bolton*, the supreme court found a jury instruction that lacked an essential element of burglary of a dwelling to be fatally defective. *Bolton*, 113 So. 3d at 545 (¶5). Specifically, the jury in that case was improperly instructed to find the defendant guilty if it found that he

15

broke and entered a dwelling with the intent to commit any crime, as opposed to a specific crime as required by statute. *Id*. In *Harrell*, the supreme court found that, for a capital-murder charge, the circuit court's failure to instruct the jury as to the elements of the underlying felony of robbery was reversible error. *Harrell*, 134 So. 3d at 270 (¶14).

¶38. In *Snowden*, a case more on point, Snowden was specifically accused of aggravated assault under section 97-3-7(2)(a), but he was only accused of causing "bodily injury." As we explained, section 97-3-7(2)(a) required proof of "serious bodily injury." This Court held that the circuit court erred by allowing the prosecution to proceed on an indictment that specifically charged Snowden with aggravated assault under section 97-3-7(2)(a) when the indictment did not include all of the essential elements required for a conviction under that provision. *Snowden*, 131 So. 3d at 1259 (¶22).

¶39. We see no reason why the same safeguards are not applicable in the case at bar. Here, it is clear that the jury instructions given at trial regarding the four aggravated-assault crimes track the language of Mississippi Code Annotated section 97-3-7(2)(b) (Rev. 2006), which required "purposely or knowingly causing **bodily injury** to another with a deadly weapon or other means likely to produce death or serious bodily harm[.]"[1] (Emphasis added). Therefore, the instructions were inadequate and did not require the jury to find that a "serious" bodily injury occurred as stated in the indictment. This omission substantially

---

[1] The Legislature amended section 97-3-7(2)(a) to include what had once been section 97-3-7(2)(b), "A person is guilty of aggravated assault if he . . . purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm[.]" Miss. Code Ann. § 97-3-7(2)(a) (Supp. 2013).

16

altered the proof necessary for a conviction in this case and broadened the grounds upon which Brown was convicted.

¶40.    The supreme court has held that "a constructive amendment of the indictment occurs when the proof and instructions broaden the grounds upon which the defendant may be found guilty of the offense charged so that the defendant may be convicted without proof of the elements alleged by the grand jury in its indictment." *Bell v. State*, 725 So. 2d 836, 855 (¶58) (Miss. 1998).  In short, a constructive amendment "effectively modifies an essential element of the offense charged." *Id.* at 856 (¶61).  Pursuant to *Bell*, we find that the language "bodily injury" without the word "serious" was a constructive amendment in the case at hand.  "Not all variances between the indictment and instructions constitute a constructive amendment, nor do they rise to plain error." *Id.* at 855 (¶61).  "The central question is whether the variance is such as to substantially alter the elements of proof necessary for a conviction." *Id.*

¶41.    In *Fleming v. State*, 604 So. 2d 280, 293 (Miss. 1992), the supreme court recited the definition of "serious bodily injury" contained in the Model Penal Code § 210 (1980), which states: "'[S]erious bodily injury'" [means] bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."  Here, the jury was not asked to decide on the specific issue of whether the injuries inflicted upon Murdock, Smoot, King, and Walker were "serious" bodily injuries, which substantially altered the elements of proof for a conviction.  Furthermore, a deadly weapon is not an element of the crime as suggested by the jury

17

instructions. This too was a variance between the indictment and the jury instructions. As such, the jury instructions did not "fairly . . . instruct[] the jury on the applicable law." *Conner v. State*, 138 So. 3d 143, 150 (¶16) (Miss. 2014). We reverse and remand for a new trial with respect to the aggravated-assault charges.

## V. Pro Se Claims

¶42. Brown claims he was entitled to a flight instruction, which would have directed the jury that they could consider Coleman's flight from the bar as a conscious sense of guilt. Brown has not supported this argument with any caselaw, nor can we find any legal support for this contention. Furthermore, the jury was allowed to make its own conclusion after hearing Coleman's testimony as to why he left after the incident.

¶43. Finally, Brown argues that he was subjected to double jeopardy when he went to his second trial in light of the first one ending in a mistrial. "If a mistrial is granted upon the court's motion or upon the State's motion, a second trial is barred because of double jeopardy, unless taking into consideration all the circumstances there was a 'manifest necessity' for the mistrial." *Jenkins v. State*, 759 So. 2d 1229, 1234 (¶18) (Miss. 2000) (citing *Watts v. State*, 492 So. 2d 1281, 1284 (Miss. 1986)). The trial court declared a mistrial, which the State and Brown's counsel agreed to, because a detective testifying as a witness improperly commented on Brown's Fifth Amendment right. The trial court further found that "a mistrial was warranted to protect [Brown]'s constitutional rights." We agree with the trial court in that there was a manifest necessity for the mistrial, and therefore double jeopardy did not attach.

¶44. In light of our findings, we affirm in part, reverse in part, and remand.

18

¶45.   **THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT, OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. THE JUDGMENT OF CONVICTION OF FOUR COUNTS OF AGGRAVATED ASSAULT IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.**

  **LEE, C.J., BARNES, CARLTON, FAIR, JAMES AND GREENLEE, JJ., CONCUR. WILSON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. IRVING AND GRIFFIS, P.JJ., CONCUR IN PART AND DISSENT IN PART WITHOUT SEPARATE WRITTEN OPINION.**