## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-01266-COA

ROOSEVELT HARRIS                                    APPELLANT

v.

STATE OF MISSISSIPPI                                    APPELLEE

DATE OF JUDGMENT:           09/22/2017
TRIAL JUDGE:                HON. WILLIAM E. CHAPMAN III
COURT FROM WHICH APPEALED:  RANKIN COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:    OFFICE OF STATE PUBLIC DEFENDER
                            BY: HUNTER NOLAN AIKENS
                                GEORGE T. HOLMES
                            ROOSEVELT HARRIS (PRO SE)
ATTORNEY FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
                            BY: SCOTT STUART
DISTRICT ATTORNEY:          MICHAEL GUEST
NATURE OF THE CASE:         CRIMINAL - FELONY
DISPOSITION:                AFFIRMED IN PART; REVERSED AND
                            RENDERED IN PART - 08/25/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**BARNES, C.J., FOR THE COURT:**

¶1.     A Rankin County Circuit Court jury convicted Roosevelt Harris (Harris) of three counts: receiving stolen property (Count I); possessing a motor vehicle with an altered vehicle identification number (VIN) (Count II); and making fraudulent statements and representations to defraud the government (Count III).  The circuit court sentenced Harris as a non-violent habitual offender under Mississippi Code Annotated section 99-19-81 (Rev. 2015) and ordered him to serve the following sentences in the custody of the Mississippi

Department of Corrections (MDOC) without eligibility for probation or parole: ten years for Count I; five years for Count II, with the sentence to run concurrently with the sentence in Count I; and five years for Count III, with the sentence to run consecutively to the sentences in Counts I and II.

¶2. On appeal, Harris's appointed attorney argues that (1) the circuit court erroneously denied Harris's motion to suppress evidence, (2) the evidence was insufficient to support the jury's verdict as to each count, and (3) the court erroneously sentenced Harris as a habitual offender. Harris filed a pro se supplemental brief, reiterating these arguments and alleging numerous additional errors. In reviewing Harris's pro se arguments, we address the merits of those claims raised before the circuit court, and we review under plain-error analysis any "obvious errors" that affect Harris's "fundamental, substantive right[s.]" *See Chambliss v. State*, 233 So. 3d 898, 903 (¶24) (Miss. Ct. App. 2017). As for Harris's pro se arguments not raised during trial or in the post-trial motion, and for which we find no basis for reversal under a plain-error analysis, we conclude those issues are waived, and we decline to address them on appeal. *See Kidd v. State*, 284 So. 3d 777, 784 (¶30) (Miss. Ct. App. 2019).

¶3. Specifically, we address the following errors alleged by Harris in his pro se supplemental brief: (1) the State failed to preserve evidence; (2) the circuit court sentenced Harris to an illegal sentence; (3) the circuit court erred by allowing the State to instruct the jury on the law; (4) Harris was subjected to double jeopardy for his convictions in Counts I and II; (5) Harris's constitutional right to a speedy trial was violated; (6) the State committed

2

prosecutorial misconduct during its closing argument; and (7) Harris's trial attorneys rendered ineffective assistance of counsel.

¶4.     Upon review, we find that the State presented insufficient evidence to support the jury's verdict for Count III, which charged Harris with making fraudulent statements and representations to defraud the government. We therefore reverse and render a verdict in Harris's favor as to the judgment of conviction and sentence for Count III. With regard to the remaining assignments of error raised by Harris and his attorney, we find they lack merit. Accordingly, we affirm Harris's convictions and sentences for Counts I and II.

## FACTS AND PROCEDURAL HISTORY

¶5.     On January 22, 2013, Larry Kimzey reported that his truck, a 2013 white Ford F-150, had been stolen. He filed a claim with Mississippi Farm Bureau (Farm Bureau), which determined the total adjusted value of Kimzey's truck to be $39,741, and paid Kimzey a settlement claim of $39,650 for his stolen truck.

¶6.     On May 17, 2016, Sergeant Brad Conner with the Brandon Police Department was working traffic detail on Interstate 20 when he received a be-on-the-lookout notification (BOLO) for a stolen vehicle traveling westbound. The BOLO described the stolen vehicle as a white Ford F-150 displaying the license plate number WB3 928. Sergeant Conner saw a truck drive by matching the description of the stolen vehicle, and he observed that the truck was driving eighty miles per hour in a sixty-mile-per-hour speed zone and had the same license plate number as given in the BOLO. Sergeant Conner pursued the vehicle, but before

3

he could activate his blue lights, the truck pulled to the side of the interstate. Sergeant Conner activated his blue lights and parked behind the truck. The traffic stop occurred around 1:08 a.m.

¶7. The truck contained two individuals later identified as Harris and Harris's son, Roosevelt Harris III (Roosevelt). Because Sergeant Conner was alone and had reason to believe that the truck was stolen, he asked Harris and Roosevelt to exit the truck and handcuffed them for his own safety. Sergeant Conner advised Harris and Roosevelt of their *Miranda*[1] rights, and Harris responded that he understood his constitutional rights. When questioned about the truck, Harris indicated to Sergeant Conner that he had owned the truck for about a year. Sergeant Conner asked for Harris's consent to search the truck for documentation to determine whether the vehicle was stolen. Harris consented to the search, and Sergeant Conner retrieved a certificate of title, a bill of sale, insurance cards, and a vehicle registration from inside the truck. The certificate of title and bill of sale indicated that Harris bought the truck from Stan King Chevrolet on July 10, 2015, and the vehicle's registration showed that Harris had been issued the license plate number WB3 928. Sergeant Conner called in the truck's VIN, which was a "sticker," but no record of the VIN was found. Sergeant Conner arrested Harris and had the truck towed to the police department. There, it was discovered that the VIN "sticker" had been covering the truck's original VIN, which matched the VIN of the stolen truck.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

4

¶8. Harris was charged with possession of stolen goods, possession of a vehicle with an altered VIN, and making a false representation to defraud the government.

¶9. Harris filed a pretrial motion to suppress the evidence (the title application and bill of sale) that Sergeant Conner obtained during the search, arguing that because the officer had illegally arrested Harris prior to conducting the search, the search incident to the arrest was invalid, and the evidence Sergeant Conner had obtained was inadmissible. Following a hearing, the circuit court denied Harris's motion to suppress.

¶10. At trial, Sergeant Conner confirmed that he recovered a bill of sale, certificate of title, and proof of insurance from the truck with Harris's consent. Sergeant Conner further testified that during the traffic stop, as he noticed there was no manufacturer's VIN plate visible on the driver's side door of Harris's truck, he inspected the VIN on the truck's windshield. Rather than the typical metallic VIN plate with raised characters, the VIN on Harris's truck windshield appeared to be just a "sticker." Sergeant Conner was able to get a knife blade underneath the VIN to confirm it was "a sticker or [that] some adhesive had been laid underneath it . . . [, but] it didn't peel up." He called dispatch to run a check on the sticker VIN. Although the records check returned no results and gave no indication that the truck was stolen, Sergeant Conner was still suspicious due to the sticker's being placed over the VIN plate. After having the truck towed to the police department, Sergeant Conner testified that he was "actually able to remove the VIN plate, and it showed the true factory VIN." A search of the factory VIN revealed that Harris's truck was in fact Kimzey's stolen

5

truck.

¶11. Sergeant Conner testified that he had a camera in his patrol car that was supposed to begin recording whenever he activated his car's blue lights. Sergeant Conner explained that the server was located in the trunk of his patrol car and that any recording remained on the server until he reached the police department, at which time the recording automatically uploaded to the police department's system. However, investigators later informed him that the server in his patrol car failed to upload any video of the traffic stop. Sergeant Conner testified that he had no access to the recording system and that he had not deleted any video footage of the traffic stop. Further, he testified that Officer Michael Wallace, who arrived on the scene at approximately 1:10 a.m. to assist him with the traffic stop, had recorded footage of the stop. The State introduced into evidence the video recording from Officer Wallace's patrol car.

¶12. Lieutenant Beau Edgington, the chief investigator for the Investigations Division of the Brandon Police Department, testified that he reviewed the documents Sergeant Conner had collected from Harris's truck. Lieutenant Edgington observed that the bill of sale found in Harris's truck was handwritten, which Lieutenant Edgington testified was unusual for a vehicle purchased from a dealership. He further noticed that the bill of sale indicated Harris had bought the truck from Stan King Chevrolet on July 10, 2015; some of Harris's other documents indicated that the truck had been insured since March 21, 2013.

¶13. Seth Allen, Stan King Chevrolet's business manager, testified that he had worked at

6

the dealership for over twenty years and that he filled out the dealership's title applications when the dealership sold a vehicle. The title application in Harris's possession indicated that a "John Smith" from Stan King Chevrolet had filled out the form, but Allen testified that no such person worked at the dealership. As for the bill of sale found in Harris's truck, Allen testified that the dealership did not usually sign bills of sale as "Stan King Chevrolet" or use handwritten bills of sale like the one in Harris's possession. Allen further testified that he had checked the dealership's records for the VIN listed on Harris's documents, and his search showed no matches to the VIN listed on Harris's documents. The dealership's records further indicated that the dealership had never sold any vehicle to Harris.

¶14. Harris's title application also listed Santander, Consumer USA (Santander) as the lien holder on the truck. Robert Baine, who worked for Santander's subsidiary Chrysler Capital, testified, however, that Santander's business records indicated Santander had never financed a vehicle to Harris bearing the VIN and description of the subject truck. Baine did note, though, that Santander had financed a Town and Country van bearing a different VIN to Harris.

¶15. During his investigation, Lieutenant Edgington learned that since Harris's alleged purchase of the truck, Harris had applied for multiple license plates in different counties and that each new license plate had a different number from the preceding license plates. Lieutenant Edgington stated that the multiple license plates with different numbers could be accomplished by using forged documents, such as a fraudulent bill of sale or title application.

7

Lieutenant Edgington explained that if a person obtained a license plate without clear title to the vehicle, a "trap" would be "placed on that tag because a clear title was not obtained for the trap to be removed from that tag." The trap would then remain in place for one year, which provided the buyer with time to produce clear title to the vehicle. Harris was never able to produce clear title to the truck, which resulted in the multiple license plates with different numbers. Lieutenant Edgington testified that Harris "would obtain a new set of false documents to obtain a new tag with a new trap for one more year[,]" which allowed Harris to drive the truck without raising too much suspicion.

¶16. Diane Davaul, who worked as the Claiborne County Tax Assessor and Tax Collector, testified about two of the license plates that Harris obtained for his truck. According to Davaul, a title application bearing Harris's name was submitted for the stolen truck in 2013. The title application indicated that Harris had purchased the truck on February 14, 2013. The following year, instead of a renewing his license plate, Harris submitted an entirely new title application. Unlike the 2013 application, the 2014 application provided that Harris had purchased the same subject vehicle on March 11, 2014. Davaul further testified that the same VIN was listed on both title applications.

¶17. Antonia Jones testified about a third license plate that Harris obtained for the truck. Unlike the two prior license plates obtained in Claiborne County, Harris obtained the third license plate from the Warren County Tax Collector's Office. Jones testified that Harris's third title application indicated that Harris had purchased the truck on July 10, 2015. Jones

8

further testified, however, that Harris never obtained good title for the truck. With regard to this point, Jones stated, "When I went back to look it [(the title)] up in the system, there was a trap that was created, which is the terminology that the Department of Revenue uses when the title has not been issued yet." According to Jones, if a trap has been issued, the vehicle owner is not supposed to receive a license plate renewal for the vehicle. Jones further testified that if someone had been unable to renew his license plate in the ordinary manner for three years, that would usually indicate to the person "that something [had not] been properly completed by the dealership."

¶18. The State presented evidence regarding the monetary value of the stolen truck as of the date that Kimzey filed his insurance claim and as of the date of Harris's traffic stop. Smiley Herrington, a senior claims representative with Farm Bureau, testified that he had access to Farm Bureau's business records and to the documents related to the theft of Kimzey's 2013 Ford F-150. Herrington testified about a vehicle valuation sheet Farm Bureau had created after Kimzey reported his truck stolen. Herrington confirmed that Farm Bureau had paid Kimzey $39,650 for his claim and that Farm Bureau had then become the legal owner of the vehicle.

¶19. Lieutenant Edgington also provided testimony about the value of the truck as of the date of the traffic stop on May 17, 2016. Lieutenant Edgington stated that he visited a local Ford dealership and asked an employee to look up the stolen truck's VIN. After figuring out exactly which options had been installed on the truck, Lieutenant Edgington looked up the

9

truck's value in the Kelly Bluebook Used Car Guide for Consumers (the Kelly Bluebook). From the values provided, Lieutenant Edgington selected the lowest one, which was $22,300.

¶20. Tyrone King Sr. testified as a witness for the defense. King owned Williams Auto Sales and met Harris while working at a car dealership. King testified that he had conducted business deals with Harris. Because Harris detailed cars and owned a taxi service, King had employed Harris to detail King's personal cars. King testified that while he had sold Harris four vans for Harris's taxi service, he had never sold Harris a white Ford truck.

¶21. Harris testified on his own behalf. He stated that on May 17, 2016, he and his son were driving back to Mississippi from Georgia. As he entered Rankin County, he pulled to the side of the road to retrieve a CD from his truck's console. When he looked up, he saw a patrol car park behind his truck. Harris stated that the patrol car's blue lights activated, and the officer, who identified himself as Sergeant Conner, ordered Harris and Roosevelt to exit the truck. According to Harris, Sergeant Conner handcuffed him and his son without stating a reason for their arrest and ordered them to sit on the truck's tailgate while Sergeant Conner searched the truck. Harris stated that at the time Sergeant Conner handcuffed him and Roosevelt, Sergeant Conner had not yet inspected the vehicle's VIN.

¶22. Harris denied having placed a sticker over the truck's actual VIN, and he asserted that he had no knowledge of any problems with the truck's VIN prior to his arrest. Harris said that King had offered to help Harris get a good deal if Harris ever needed a vehicle; so he

bought the 2012[2] Ford F-150 truck from King, who used his car-detailing services. Although evidence reflected that the truck's value at that time was around $40,000, Harris purchased the truck for $20,000. Admitting that he did not have the cash to pay for the truck in full, Harris said King claimed he "could take care of all the finances" and "would take care of everything" for Harris. According to Harris, he obtained the title application and bill of sale for the truck from Joseph Williams, who apparently worked for King. Harris used the paperwork to obtain a Claiborne County license plate for the truck.

¶23. The first title application that Harris took to the Claiborne County Tax Assessor's Office stated that Harris had bought the truck on February 14, 2013. Although the license plate expired in February 2014, Harris testified that he received no renewal notice. Harris stated that he first learned there was a problem with his paperwork when he returned to the Claiborne County Tax Assessor's Office in 2014 to obtain a new license plate. Harris testified that an employee at the tax assessor's office told him there was an issue with his paperwork and that he "needed to go back to where [he] purchased the truck from and get them to straighten out the paperwork." Harris called Williams, who met with him and provided him with new paperwork. Harris returned to the tax assessor's office with his new paperwork, which indicated that Harris had purchased the truck on March 11, 2014, rather than on February 14, 2013. When questioned about the date discrepancy on the title

---

[2] The record reflects that the stolen vehicle was manufactured in 2013, but Harris testified that he thought the truck had been manufactured in 2012.

11

applications, Harris claimed that he had simply failed to read all the paperwork thoroughly before he signed the documents.

¶24. Harris testified that on May 30, 2014, he received a speeding ticket in Sharkey County and that the officer had made no mention at that time of the truck's being stolen. Harris further stated that two months later, on July 26, 2014, he backed into someone else's vehicle. He reported the accident to the police, filled out an accident report, and filed an insurance claim to have the other driver's vehicle repaired. Once again, Harris averred that no one ever indicated that the truck might have been stolen.

¶25. On July 10, 2015, Harris applied for a third license plate, this time in Warren County. Harris was again told there was an issue with his paperwork; so he once again obtained new paperwork from Williams. Harris said that he was not informed of any problems with the new paperwork when he bought the third license plate in July 2015. On July 12, 2015, Harris called the police to report some damage to the truck. He also testified that on April 3, 2016, he received a speeding ticket and that no issue was raised at either time about his truck's possibly being stolen.

¶26. Harris acknowledged that he had a 1999 felony conviction for robbery. He stated that he had pled guilty to the robbery charge because he had committed the crime. Harris further stated, however, that he had not pled guilty to the present charges because he had not committed them.

¶27. On cross-examination, Harris testified that he had completed some college education

12

and that he owned both a car-wash business and a taxi company. Harris admitted he knew a little something about purchasing vehicles, as he had purchased about eighteen cars while operating his taxi company. Harris further acknowledged that Williams's name was not listed on any of the paperwork for his truck. When questioned whether the bill of sale having "Stan King Chevrolet" on it raised a "red flag" for him, Harris responded that it did not. Harris testified that it was a simple "oversight" on his part that one of the title applications indicated the truck had been sold in July 2015, even though he had purchased the truck in 2013. Although Harris had planned to make payments to Williams for the truck, the original title application indicated that Santander was the lien holder on the truck. When the State asked Harris on cross-examination if he had been concerned about buying a brand new truck for only $20,000 with a lien holder listed on the title application, Harris responded, "I trusted Joe [Williams]. I just pay him, and he takes care of everything, just the same as Tyrone [King]. I pay Tyrone [King], so I don't know anything about the lien[]holder, sir."

¶28.   The jury found Harris guilty of all three counts. On September 22, 2017, the circuit court entered the judgment of conviction, sentencing Harris as a habitual offender to serve ten years for Count I; five years for Count II, with the sentence to run concurrently with the sentence in Count I; and five years for Count III, with the sentence to run consecutively to the sentences in Counts I and II. The circuit court ordered that Harris serve all three sentences in the MDOC's custody without eligibility for probation or parole. Harris filed a motion for judgment notwithstanding the verdict or, alternatively, a new trial, which was

13

denied. Aggrieved, he appeals.

DISCUSSION

### I. Motion to Suppress

¶29. Prior to trial, Harris filed a motion to suppress the evidence obtained during the traffic stop. A motions hearing was held, and the circuit court denied the motion to suppress, finding that

> the facts available to the officer there on the scene would give rise to a reasonable suspicion of criminal activity, that being the altered VIN, and I believe that supported a reasonable suspicion that the vehicle may have been stolen or that the defendant was involved in some criminal activity. So for all of those reasons, I believe there was probable cause to make an arrest.

Both Harris and his attorney argue on appeal that Sergeant Conner violated Harris's Fourth Amendment right to be free from an illegal search and seizure. According to Harris's attorney, Sergeant Conner exceeded the scope of a permissible investigatory traffic stop when he handcuffed Harris without any probable cause for an arrest. Harris's attorney further asserts that any consent Harris gave for Sergeant Conner to search his truck was tainted by the illegal detainment. In addition, Harris argues in his pro se supplemental brief that Sergeant Conner lacked probable cause to search his vehicle. As a result of these alleged errors, both Harris and his attorney contend that the evidence Sergeant Conner obtained during the search of the truck was inadmissible and that the circuit court erred by denying Harris's motion to suppress the evidence.

¶30. We apply a mixed standard of review to a circuit court's denial of a motion to

14

suppress. *Holloway v. State*, 282 So. 3d 537, 541 (¶13) (Miss. Ct. App. 2019). We review de novo the circuit court's "[d]eterminations of reasonable suspicion and probable cause[,]" but "we review the trial judge's 'findings of historical fact only for clear error.'" *Wrenn v. State*, 281 So. 3d 838, 841 (¶12) (Miss. Ct. App. 2018) (quoting *Floyd v. City of Crystal Springs*, 749 So. 2d 110, 113 (¶11) (Miss. 1999)).

### A. Traffic Stop

¶31. Sergeant Conner testified that he witnessed Harris committing a traffic violation when Harris drove by him at eighty miles per hour in a sixty-mile-per-hour speed zone. "As a general rule, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Austin v. State*, 72 So. 3d 565, 568 (¶10) (Miss. Ct. App. 2011) (internal quotation marks omitted) (quoting *Drummer v. State*, 42 So. 3d 563, 565 (¶8) (Miss. Ct. App. 2009)).

¶32. Furthermore, Harris's truck not only matched the description of the stolen truck but also had the same license plate number identified in the BOLO that the officer had just received. An investigatory traffic stop is permissible where an "officer has reasonable suspicion to believe that the occupants of [a] vehicle have been, are currently, or are about to be involved in criminal activity." *Wrenn*, 281 So. 3d at 842 (¶13). As we have previously explained:

> Reasonable suspicion must be grounded in specific and articulable facts and can arise from an officer's personal observations, a tip by a trusted informant, or even an anonymous tip. Thus, reasonable suspicion is based on something less than the personal observation of a violation of law. Reasonable suspicion

15

is the standard for a stop or search based on suspicious activity that does not yet amount to criminal activity, but which compels an officer to believe that criminal activity has happened, is happening, or is about to happen.

Probable cause, on the other hand, is a higher standard and requires a higher level of suspicion than reasonable suspicion. Most traffic stops are based on probable cause because they are based on a law[-]enforcement officer's direct observation of a traffic violation. An officer who witnesses an actual violation necessarily has probable cause to stop the vehicle.

*Id.* at (¶¶13-14) (internal quotation marks omitted) (quoting *Cooper v. State*, 145 So. 3d 1164, 1168 (¶11) (Miss. 2014); *Martin v. State*, 240 So. 3d 1047, 1051 (¶¶11-12) (Miss. 2017)). Based on these facts, we find no error in the circuit court's determination that Sergeant Conner had not only reasonable suspicion but also probable cause to conduct an investigatory stop of Harris's truck.

¶33. We further find no merit to Harris's assertion that Sergeant Conner exceeded the scope of a permissible traffic stop when he asked Harris and Roosevelt to exit the truck and then handcuffed them. This Court has held that "[a] police officer has the authority to stop a motorist if he believes that person is committing a traffic offense . . . [and] may take precautions to ensure his personal safety." *McFarland v. State*, 936 So. 2d 960, 963 (¶12) (Miss. Ct. App. 2006) (citations omitted). We further recognized in *Wrenn*, 281 So. 3d at 843 (¶17), that "officers are 'authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)).

¶34. In *Wrenn*, a police officer stopped a vehicle matching the "description of the truck

16

driven by a fleeing suspect who had fired his shotgun minutes earlier during a [nearby] disturbance." *Id*. at 839 (¶1). Because the officer suspected the driver was armed, he waited for backup to arrive. *Id*. "With guns drawn and trained on the truck, officers ordered [John] Wrenn to exit the truck and then handcuffed him while they briefly searched the truck to make sure that no one else was inside. The officers immediately found a sawed-off shotgun and shells in the cab of the truck." *Id*. Wrenn moved to suppress the evidence "seized during the search of his truck, . . . arguing that there was no probable cause for the stop. The trial judge denied Wrenn's motion." *Id*. Determining that the officers had, at a minimum, reasonable suspicion to stop Wrenn's truck, we rejected Wrenn's argument "that the officers exceeded the scope of a valid [investigatory] stop when they ordered him from his truck at gunpoint and then handcuffed him." *Id.* at 842-43 (¶¶16-17). "[C]ourts have . . . consistently upheld such police conduct when the circumstances indicated that it was a reasonable precaution for the protection and safety of the investigating officers." *Id.* While Sergeant Conner did not draw his weapon on Harris or Roosevelt, we find our analysis in *Wrenn* informative to our discussion here.

¶35. At approximately 1:00 a.m., Sergeant Conner observed Harris speed by in a truck matching the description of a stolen vehicle. Sergeant Conner was alone when he initiated the traffic stop, and he noted that the truck contained two occupants. Sergeant Conner testified at the hearing on the motion to suppress, "At that point given the information I had, potentially there was a felony involved, it becomes a felony stop-type situation, which means

17

for us we approach with extreme caution." Based upon our review of the record and relevant caselaw, we conclude that Sergeant Conner remained within the bounds of a validly executed traffic stop when he took reasonably necessary precautions "to protect [his] own personal safety and to maintain the status quo during the course of the stop." *See id.* at 843 (¶17) (quoting *Hensley*, 469 U.S. at 235).

### B. Search and Seizure

¶36. Both Harris and his attorney attack the legality of Sergeant Conner's search of Harris's truck and the seizure of documents during the traffic stop. Harris's attorney argues that Sergeant Conner's illegal detainment of Harris invalidated any consent Harris gave to search the truck, and Harris asserts that no probable cause existed for the search. As discussed, we do not find that Sergeant Conner exceeded his authority during the traffic stop by handcuffing Harris and Roosevelt. Nor do we find that Sergeant Conner's actions converted the traffic stop into a full custodial arrest at the time he handcuffed Harris and Roosevelt for his own safety. *See id*. at 843 (¶18) (noting that "police officers do not convert a *Terry*[3] stop into a full custodial arrest" merely by drawing their weapons or handcuffing a suspect) (quoting *United States v. Shoals*, 478 F.2d 850, 853 (7th Cir. 2007)). Thus, we find no merit to these arguments.

¶37. Moreover, consent provides an exception to the prohibition against warrantless searches and seizures. *May v. State*, 222 So. 3d 1074, 1078 (¶8) (Miss. Ct. App. 2016). "To

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1968).

provide an exception to the warrant requirement, a person's consent to search must be knowing and voluntary." *Id*. at (¶9). As the *May* court explained:

> For consent to be given knowingly, the person searched must be aware he has the legal right to refuse. Voluntariness is determined from the totality of the circumstances. Factors to consider are
>
> > whether the circumstances were coercive, occurred while in the custody of law enforcement or occurred in the course of a station-house investigation. The court must also look to the individual's maturity, impressionability, experience, and education. Further, the court should consider whether the person was excited, under the influence of drugs or alcohol, or mentally incompetent. If the consent occurred while the defendant was being generally cooperative, the consent is more likely to be voluntary . . . .
>
> Where consent is given, the State is not required to demonstrate knowledge; rather, the burden is on the defendant to show impaired consent or some diminished capacity.

*Id.* at 1079 (¶9) (citations and internal quotation marks omitted).

¶38. Harris does not dispute that he consented to Sergeant Conner's request to search the truck. Nor does he contend that Sergeant Conner employed coercive tactics to obtain his consent. Additionally, Harris makes no assertion that he was under the influence of alcohol or drugs, or in any way impaired, when he provided his consent. At the time of the traffic stop, Harris had obtained some college education, was an experienced business owner, and had prior convictions that afforded him familiarity with criminal-justice proceedings. Prior to giving permission to search the truck, Harris had been advised of his *Miranda* rights and had indicated that he understood his constitutional rights. Sergeant Conner's testimony also

19

reflected that Harris was generally cooperative in answering the officer's questions about the truck's ownership. Accordingly, we decline to address Harris's argument that Sergeant Conner lacked probable cause for the search, and we find no error in the circuit court's denial of Harris's motion to suppress the evidence recovered from the truck.

## II. Sufficiency of the Evidence

¶39. Harris contends that the State presented insufficient evidence to support the jury's verdict as to each count. In reviewing Harris's argument as to the sufficiency of the evidence, we view "'the evidence in the light most favorable to the State[,]' . . . ask[ing] whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Donaldson v. State*, 262 So. 3d 1135, 1145 (¶16) (Miss. Ct. App. 2018) (quoting *Harris v. State*, 107 So. 3d 1075, 1077-78 (¶10) (Miss. 2013)). "This Court 'accepts all credible evidence consistent with guilt as true and gives the State the benefit of all favorable inferences reasonably drawn from the evidence.'" *Id*. (quoting *Moore v. State*, 160 So. 3d 728, 735 (¶31) (Miss. Ct. App. 2015)).

### A. Count I

¶40. Count I of Harris's indictment charged him with receiving stolen property, specifically, Kimzey's 2013 Ford F-150. Harris's attorney argues that the State "presented no evidence of the circumstances under which Harris came to possess the [stolen] truck" at issue and failed to prove beyond a reasonable doubt that Harris knew the truck was stolen. Harris also asserts in his pro se supplemental brief that the State failed to present sufficient

20

evidence to establish the value of the stolen truck.

¶41.    Count I of the indictment charged that on the date of the traffic stop, Harris

> did willfully, intentionally, unlawfully, and feloniously possess, receive, retain[,] or dispose of stolen property, to wit; one (1) 2013 Ford F[-]150, bearing VIN 1FTFW1EF2DFA65303, being the property of Larry Kimzey, knowing or having reasonable grounds to believe same to have been stolen wherein such property is valued at Five Thousand Dollars ($5,000.00) or more but less than Twenty-Five Thousand Dollars ($25,000.00), in violation of Mississippi Code Annotated § 97-17-70 (1972), as amended . . . .

Mississippi Code Annotated section 97-17-70(1) (Rev. 2014) provides:

> [a] person commits the crime of receiving stolen property if he intentionally possesses, receives, retains[,] or disposes of stolen property knowing that it has been stolen or having reasonable grounds to believe it has been stolen, unless the property is possessed, received, retained[,] or disposed of with intent to restore it to the owner.

Our caselaw holds that "[t]he defendant's 'actions subsequent to receipt may have a bearing on whether he knew or should have known the property to be stolen.'" *Patrick v. State*, 269 So. 3d 460, 462-63 (¶11) (Miss. Ct. App. 2018) (quoting *Whatley v. State*, 490 So. 2d 1220, 1222 (Miss. 1986)). "Guilty knowledge[,]" which "is the gist of the offense of receiving stolen property[,] . . . may be shown by evidence that the defendant received the property under circumstances that would lead a reasonable man to believe it to be stolen." *Id.* at 463 (¶11) (quoting *Whatley*, 490 So. 2d at 1222)).

¶42.    In January 2013, Kimzey reported his truck stolen, and Farm Bureau paid him $39,650 for his claim. A month later, in February 2013, Harris purchased the truck from Williams for only $20,000. As the State's evidence showed, the amount Harris paid represented

21

approximately half of the truck's appraised value at that time. The bill of sale Harris received for the truck was handwritten and provided that the auto dealership "Stan King Chevrolet," rather than Williams, was the seller. The bill of sale admitted into evidence indicated that the purchase date for the truck was July 10, 2015. Despite these inaccuracies, Harris claimed that the bill of sale failed to raise any "red flag" in his mind.

¶43. Like the bill of sale, the title application that Sergeant Conner retrieved from the truck reflected that Harris had purchased the truck on July 10, 2015. In addition, the title application identified Santander as a lien holder on the truck. Harris testified that he paid Williams "every dime" for the truck; so he did not know why the title application listed Santander as a lien holder. With regard to these discrepancies, Harris testified that the date was just an "oversight," and he just "signed it so [he] could go on with [his] life."

¶44. Harris testified that he took the bill of sale and title application to the Claiborne County Tax Assessor's Office and obtained a license plate for the truck. Davaul testified that the purchase date on the certificate-of-title application was February 14, 2013, as evidenced by the motor vehicle registration for the initial license plate. Having received no renewal form in the mail the following year, Harris returned to the tax assessor's office to obtain another license plate. The clerk at the tax assessor's officer informed Harris there was an issue with his paperwork and that he "needed to go back to where [he had] purchased the truck from and get [the seller] to straighten out the paperwork." Harris received a new title application from Williams, which he used to obtain a brand new license plate. The motor

22

vehicle registration for that tag showed the purchase date as March 11, 2014.

¶45. In July 2015, Harris went to the Warren County Tax Assessor's Office to obtain a third new license plate for the truck. He was once again informed that a problem existed with his paperwork; so Harris returned to Williams for a third title application. Jones, who worked at the Warren County Tax Collector's Office, testified that she looked up the title to Harris's truck and discovered that Harris had never obtained good title for the vehicle and that a "trap" had been issued for the truck. Jones testified that a person in Harris's position, who had been unable to renew his license plate in the ordinary manner for multiple years, would normally be alerted that a problem existed.

¶46. On cross-examination, Harris agreed that Williams's name was not listed on the bill of sale or the title application for the truck and that he never mentioned Williams to either the police officers or the District Attorney's Office. Harris also admitted that he knew "a little something about purchasing cars" because he had bought about eighteen cars while operating his taxi company. Nevertheless, Harris maintained that the discrepancies in the truck's paperwork and his recurring inability to renew his license plate in the ordinary manner failed to raise any red flags.

¶47. We find the State produced sufficient evidence to demonstrate that Harris had "guilty knowledge" with regard to the truck. The facts surrounding Harris's purchase of the truck, coupled with subsequent events during his ownership of the truck, support a finding that Harris "received the property under circumstances that would lead a reasonable man to

23

believe it to be stolen." *See Patrick*, 269 So. 3d at 463 (¶11).

¶48.   To prove the receipt-of-stolen-goods charge against Harris, the State was also required to establish the value of the stolen truck. *See Grant v. State*, 281 So. 3d 993, 996 (¶10) (Miss. Ct. App. 2019). Count I charged that the stolen truck was valued at $5,000 or more but less than $25,000. Harris contends in his pro se brief that the evidence of the Kelley Bluebook valuation was insufficient because it did not take into account the condition of the vehicle (e.g., a slipping transmission, interior body damage, and rust). Therefore, he claims the State failed to prove this element beyond a reasonable doubt.

¶49.   Mississippi Rule of Evidence 701 provides:

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to the clear understanding of the testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of [Mississippi Rule of Evidence] 702.

Thus, as explained in *Grant*:

> A lay witness may testify regarding an opinion that is rationally based upon his personal perceptions, and that will help the jury fairly resolve a controverted, material fact. In a case involving the receipt of stolen property, a lay witness must be familiar with the market value of the stolen property.

*Grant*, 281 So. 3d at 997 (¶13) (citations and internal quotation marks omitted). Lieutenant Edgington testified that he consulted a local Ford dealership to help him form an opinion about the stolen truck's value. A dealership employee used the truck's VIN to help Lieutenant Edgington determine which options had been installed on the truck. Lieutenant

24

Edgington then researched the values provided for the truck in the Kelly Bluebook, and he testified that he selected the lowest applicable value of $22,300. On cross-examination, Lieutenant Edgington explained that he took into account the truck's high mileage and that the truck was only in "good" condition due to the truck's hail damage in assessing the value.

¶50. Because the defense made no objection at trial to Lieutenant Edgington's lay testimony regarding the truck's valuation or his utilization of the Kelley Bluebook, we find that Harris has waived any argument on appeal as to the admissibility of this evidence. *See Swinney v. State*, 241 So. 3d 599, 610 (¶40) (Miss. 2018) ("The failure to object to hearsay operates as a waiver of the issue on appeal[.]"). This evidence, as presented by the State, was sufficient to prove the value of vehicle beyond a reasonable doubt.

¶51. Viewing the evidence in the light most favorable to the State, we conclude a rational juror could have found the State presented sufficient evidence to prove beyond a reasonable doubt each element of receiving stolen property.

### B. Count II

¶52. Count II of Harris's indictment charged Harris with being in possession of a motor vehicle that had an altered VIN. Both Harris and his attorney assert that the State presented no evidence to show that Harris had guilty knowledge that the truck's VIN had been altered. Mississippi Code Annotated section 63-25-5(3)(a) (Rev. 2013) states in relevant part that "[a]ny person who buys, disposes, sells, transfers[,] or possesses a motor vehicle or motor vehicle part with the knowledge that the [VIN] of the motor vehicle or motor vehicle part has

been altered, counterfeited, defaced, destroyed, disguised, falsified, forged, obliterated[,] or removed shall be guilty of a felony . . . ."

¶53.   As discussed, the jury heard ample testimony about the details of Harris's purchase of the truck and his subsequent difficulty in obtaining a license plate for the truck.  In addition, the jury heard Sergeant Conner's testimony about the unusual physical appearance of the sticker VIN displayed on the truck's windshield.  Sergeant Conner testified that VIN plates are normally metallic with raised characters.  Upon closer inspection, Sergeant Conner was able to peel away part of the sticker VIN from the underlying manufacturer's VIN.

¶54.   The jury also heard Harris's testimony that he had purchased approximately eighteen vehicles during the operation of his taxi company.  Despite this familiarity with purchasing, owning, and operating various vehicles, Harris maintained that he noticed nothing questionable about the truck's VIN.

¶55.   Viewing the evidence in the light most favorable to the State, we find the State presented sufficient evidence from which a rational juror could find beyond a reasonable doubt that Harris knew or should have known that his truck's VIN had been altered.

        C.      Count III

¶56.   Count III of the indictment charged that Harris "knowingly, willfully, unlawfully[,] and feloniously with intent to defraud" Sergeant Conner produced a false title application "knowing that the title application contained false, fictitious[,] and fraudulent statements" in violation of Mississippi Code Annotated section 97-7-10(1) (Rev. 2014), which

26

specifically provides:

> Whoever, with intent to defraud the state or any department, agency, office, board, commission, county, municipality[,] or other subdivision of state or local government, knowingly and willfully falsifies, conceals[,] or covers up by trick, scheme[,] or device a material fact, or makes any false, fictitious[,] or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious[,] or fraudulent statement or entry, shall, upon conviction, be punished by a fine of not more than Ten Thousand Dollars ($10,000.00) or by imprisonment for not more than five (5) years, or by both such fine and imprisonment.

Moving for a directed verdict at trial, defense counsel argued:

> I think it is pretty clear from the record that Sergeant Conner testified on direct that Mr. Harris was in handcuffs immediately upon being pulled over. He was asked to step out of the vehicle, and he was placed in handcuffs. Sergeant Conner went through the glove box and console and found the documents himself. Mr. Harris didn't produce anything.
>
> It's pretty clear from this record and from the suppression hearing that that's been the story all along, that Sergeant Conner found documents and got them himself. There was no action by Mr. Harris to produce those documents to Sergeant Conner. Also, there's been no evidence or testimony that Mr. Harris made these documents. The testimony has been that it's a computer generated title. Specifically we're talking about the title app. That's what the indictment charges, that . . . Harris produced a false title app to Sergeant Conner. As I've said, there's been no testimony that Mr. Harris did anything to give that document to Sergeant Conner, and there's also been no evidence that Mr. Harris produced that document in terms of typing it out, in that sense of the word produced.

Harris's appointed attorney reasserts this claim on appeal, contending that "the evidence failed to prove beyond a reasonable doubt that Harris produced the [title application] to

27

[Sergeant] Conner."[4]

¶57. We find that the State failed to provide beyond a reasonable doubt that Harris "knowingly" or "willfully" made, used, or produced the title application with the "intent to defraud" Sergeant Conner. As argued, the officer discovered the title application only after requesting Harris's consent to search the truck. Further, Harris testified that it was Williams, not he, that created the title application. The State produced no evidence to the contrary. Therefore, we reverse Harris's conviction for Count III and render a verdict in his favor as to that charge.

### III.    Habitual Offender Status

¶58. In sentencing Harris as a habitual offender, the circuit court relied on evidence showing that Harris had been convicted of five prior felonies. At the hearing on Harris's post-trial motion, the defense successfully demonstrated that Harris was not the named defendant in three of the prior felony convictions. However, the circuit court ruled that Harris's remaining two felony convictions sufficiently established his habitual offender status under section 99-19-81. Harris and his appointed attorney both challenge Harris's sentencing as a non-violent habitual offender under section 99-19-81. Harris's attorney argues that one of the underlying convictions used to enhance Harris's sentence—a felony drug conviction

---

[4] The separate opinion supports its finding that there was sufficient evidence of his intent to defraud by the fact that Harris allegedly provided fraudulent information to the tax collectors to obtain title. However, as stated, the indictment only charged Harris with the intent to defraud Sergeant Conner, not the tax collectors.

28

from Georgia—failed to satisfy the requirements of section 99-19-81, and Harris contends that the State failed to prove his habitual offender status by competent evidence.

¶59.    Section 99-19-81 states:

> Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, shall be sentenced to the maximum term of imprisonment prescribed for such felony unless the court provides an explanation in its sentencing order setting forth the cause for deviating from the maximum sentence, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.

With regard to the two prior felony convictions, Harris acknowledged that he was the named defendant in each cause number. Harris raised no objection to the circuit court's reliance on a 2000 felony conviction from Texas for aggravated robbery with a deadly weapon, for which Harris received a ten-year sentence.

¶60.    Harris did object, however, to the circuit court's reliance on a 1992 felony conviction from Georgia for the sale of cocaine. Harris pled guilty to the 1992 charge, and the Superior Court of Gwinnett County, Georgia, initially sentenced him to serve five years "in the State Penal System or such other institution as the Commissioner of the State Department of Corrections or Court may direct[,]" with one year to serve and four years of supervised probation. After he served ten months of his five-year sentence, Harris received probation. Harris argues that this conviction failed to provide a sufficient basis to sentence him as a habitual offender under section 99-19-81 because he served less than one year of his sentence

29

for the 1992 conviction, and the Georgia superior court ordered Harris to serve his probation at a county public works camp, which is not a state or federal penal institution as required under the statute.

¶61.    As the Mississippi Supreme Court has held, "[A] defendant is not required to have actually served time in prison for [s]ection 99-19-81 to apply.  Rather, the relevant inquiry is whether the defendant was *sentenced* to a term of imprisonment of one year or more for two prior felony convictions." *Thomas v. State*, 247 So. 3d 1252, 1257-58 (¶15) (Miss. 2018) (citing Miss. Code Ann. § 99-19-81).  "The statute is satisfied where the defendant was twice previously convicted of separate felonies and a sentence of one or more years was pronounced, *regardless of subsequent probation or suspension of sentence*." *Smith v. State*, 291 So. 3d 1140, 1142 (¶6) (Miss. Ct. App. 2020) (quoting *Nathan v. State*, 142 So. 3d 1094, 1097 (¶10) (Miss. Ct. App. 2013)).

¶62.    The State presented certified exhibits that showed Harris had pled guilty, and was convicted of one prior felony in Texas and had been found guilty of a second felony conviction in Georgia.  The State's evidence further demonstrated that the two prior felony convictions had arisen from separate incidences and that Harris had been sentenced to serve at least one year for each conviction in a state or federal penal institution.   Harris's subsequent probation served at the county work camp had no effect on his habitual offender status under section 99-19-81.  *See Smith*, 291 So. 3d at 1142 (¶6).  Accordingly, we find no error in the circuit court's decision to sentence Harris as a habitual offender under section 99-

19-81.

## IV.    Preservation of Evidence

¶63.    Prior to trial, the defense raised the issue of spoliation of evidence because the State failed to provide any video footage of the traffic stop from Sergeant Conner's patrol car. Harris asserts that the State violated his due process rights by intentionally failing to preserve the video footage.

¶64.    To prove a violation his due process rights for the failure to preserve evidence, Harris was required to show the following:

> (1) the evidence in question . . . possess[ed] an exculpatory value that was apparent before the evidence was destroyed; (2) the evidence . . . [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means; and (3) the prosecution's destruction of the evidence . . . [was] in bad faith.

*Robinson v. State*, 247 So. 3d 1212, 1234 (¶56) (Miss. 2018) (quoting *State v. McGrone*, 798 So. 2d 519, 523 (¶11) (Miss. 2001)).  We find Harris has failed to prove the third prong of this test.  "Bad faith, the third and final prong, is defined as 'not simply bad judgment or negligence, but rather conscious doing of a wrong because of dishonest purpose or moral obliquity.'"  *Id.* at 1234-35 (¶57) (quoting *Murray v. State*, 849 So. 2d 1281, 1286 (¶19) (Miss. 2003)).  "Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process." *Young v. State*, 236 So. 3d 49, 56 (¶31) (Miss. 2017) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

¶65. The evidence reflects that Sergeant Conner's patrol car failed to capture any video footage of the traffic stop. Sergeant Conner testified that his patrol car's recording system usually activated when he turned on the car's blue lights and that the footage automatically uploaded to the police department's system when he reached the department. After the traffic stop involving Harris, investigators discovered that Sergeant Conner's patrol car never uploaded any video. Sergeant Conner, however, testified that he was "locked out of the system" and had no control over whether his patrol car's footage properly uploaded and averred that he never attempted to delete or cut off the footage of the traffic stop. According to Lieutenant Edgington's testimony, the police department determined that Sergeant Conner's video camera was simply not working at the time of the traffic stop and had therefore failed to record any footage. Because we find Harris has failed to prove that the State acted in bad faith, this argument lacks merit.

## V. Illegal Sentence

¶66. In his next pro se argument, Harris asserts that his sentences "are grossly disproportionate to the nature of the offense," citing *Solem v. Helm*, 463 U.S. 277 (1983). In *Solem*, "the United States Supreme Court held that a criminal sentence must not be disproportionate to the crime for which the defendant is being sentenced." *Clowers v. State*, 522 So. 2d 762, 764 (Miss. 1988) (citing *Solem*, 463 U.S. at 290). The objective factors guiding a proportionality analysis under *Solem* are: "(1) the gravity of the offense and the harshness of the penalty; (2) comparison of the sentence with sentences imposed on other

32

criminals in the same jurisdiction; [and] (3) comparison of sentences imposed in other jurisdictions for commission of the same crime with the sentence imposed in this case." *Id*. (citing *Solem*, 463 U.S. at 290-91). Specifically, Harris contends that the circuit court "enhanced his sentence" because Harris would not enter a guilty plea and instead exercised his right to a jury trial.

¶67. However, as our supreme court recently addressed, "*Solem* must now be viewed in the light of *Harmelin v. Michigan*, 501 U.S. 957 [(1991)]." *Nash v. State*, 293 So. 3d 265, 269 (¶13) (Miss. 2020) (other citation omitted). "[T]he controlling opinion in *Harmelin* concluded that the Eighth Amendment contains a narrow proportionality principle[] that does not require strict proportionality between a crime and sentence but rather forbids only extreme sentences that are grossly disproportionate to the crime." *Id*. (internal quotation marks omitted) (quoting *Graham v. Florida*, 560 U.S. 48, 59-60 (2010)). Therefore, in determining whether "a particular sentence is grossly disproportionate, a court must first compare the gravity of the offense to the severity of the sentence." *Id*. It is only the exceedingly "rare case" where "'this threshold comparison leads to an inference of gross disproportionality' should the court 'then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with sentences imposed for the same crime in other jurisdictions.'" *Id*. (quoting *Graham*, 560 U.S. at 60). We find that Harris has failed to establish the requisite inference of gross disproportionality that would lead to a *Solem* analysis, and neither of the two comparative cases or sentences Harris

references in his pro se brief involve defendants being sentenced as habitual offenders.

¶68. Further, "[s]entencing is within the complete discretion of the trial court and not subject to appellate review if it is within the limits prescribed by statute." *Carson v. State*, 161 So. 3d 153, 156 (¶7) (Miss. Ct. App. 2014) (quoting *Wall v. State*, 718 So. 2d 1107, 1114 (¶29) (Miss. 1998)). "As a general rule, a sentence that does not exceed the maximum period allowed by statute will not be disturbed on appeal." *Id*. at 156-57 (¶7) (quoting *White v. State*, 742 So. 2d 1126, 1135 (¶35) (Miss. 1999)). Because we have reversed Harris's conviction for Count III and rendered a verdict in his favor, we address only the merits of Harris's illegal-sentence claim with respect to the sentences imposed in Counts I and II.

¶69. Count I of Harris's indictment charged him with receiving stolen property valued at $5,000 or more but less than $25,000. Mississippi Code Annotated section 97-17-70(5) (Rev. 2014) states:

> Any person who shall be convicted of receiving stolen property which exceeds Five Thousand Dollars ($5,000.00) or more but less than Twenty-five Thousand Dollars ($25,000.00) in value shall be punished by imprisonment in the custody of the State Department of Corrections for a term not exceeding ten (10) years or by a fine of not more than Ten Thousand Dollars ($10,000.00), or both.

The circuit court sentenced Harris to serve ten years in the MDOC's custody for Count I, which clearly fell within the sentencing limit of section 97-17-70(5).

¶70. Count II of Harris's indictment charged Harris with being in possession of a motor vehicle that had an altered VIN. The circuit court sentenced Harris to serve five years in the MDOC's custody for Count II, with the sentence to run concurrently with the sentence

34

imposed in Count I. Section 63-25-5(3)(a) provides that any person convicted under that subsection "shall be punished by imprisonment for not more than five (5) years and by a fine of not more than Five Thousand Dollars ($5,000.00)." Thus, Harris's sentence in Count II also fell within the statutory sentencing limits.

¶71. After determining that Harris's prior felony convictions satisfied the requirements for enhancement under section 99-19-81, the circuit court sentenced Harris as a habitual offender without eligibility for parole or probation. Section 99-19-81 provides that any person convicted as a habitual offender under that statute

> shall be sentenced to the maximum term of imprisonment prescribed for such felony unless the court provides an explanation in its sentencing order setting forth the cause for deviating from the maximum sentence, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.

In compliance with section 99-19-81, the circuit court sentenced Harris to the maximum term of imprisonment for the charges in Counts I and II without eligibility for parole or probation. Because the sentences imposed by the circuit court fall within the applicable statutory sentencing limits, we find no inference of gross disproportionality. *See Mosley v. State*, 104 So. 3d 839, 841-42 (¶9-11) (Miss. 2012) (finding no inference of gross disproportionality because the trial court's 126-year sentence was within the statutory limits). This assignment of error lacks merit.

## VI. Improper Jury Instruction

¶72. Harris argues that the State improperly instructed the jury on the law of the case.

According to Harris, "[a]fter closing arguments, [the] State was allowed . . . to use a film projector to project images of the law to impress upon the minds of the jury as to what must be done to find [him] guilty of the charged offenses." Harris raised this issue pro se before the circuit court in the hearing on his post-trial motion.

¶73.   This Court has held that a circuit court has discretion to allow the use of a projector in the courtroom, especially to the extent that such use "aids the jury in understanding . . . [a] witness or other evidence" and "so long as the purpose for using the projector was not to inflame the jury." *Sanders v. State*, 63 So. 3d 554, 576 (¶72) (Miss. Ct. App. 2010) (quoting and citing *Brawner v. State*, 872 So. 2d 1, 14-15 (¶41) (Miss. 2004)). Here, in response to Harris's post-trial argument, the circuit judge clarified that he, not the State, had instructed the jury on the caselaw. The circuit judge further explained that although he did not remember the State's using a projector during its closing argument, he did allow parties to project a previously given jury instruction while making the closing arguments. Because such a purpose aids the jury in its understanding of the evidence rather than serving to inflame the jury, we find no abuse of discretion in the circuit court's decision to allow the State to use a projector in this manner.

### VII.   Double Jeopardy

¶74.   For the first time on appeal, Harris asserts that Counts I and II of his indictment subjected him to double jeopardy. Because Harris's argument implicates a fundamental constitutional right, we address the merits of his claim. *See Graves v. State*, 969 So. 2d 845,

846-47 (¶6) (Miss. 2007) (Because the "protection against double jeopardy is a fundamental right," it is not subject to a procedural bar on appeal.)

¶75. "Double jeopardy 'protects against multiple punishments for the same offense.'" *Dancy v. State*, 287 So. 3d 931, 940 (¶35) (Miss. 2020) (quoting *White v. State*, 702 So. 2d 107, 109 (¶9) (Miss. 1997)). "When determining whether double-jeopardy protections apply, we look to the 'same elements' test prescribed by the United States Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304 (1932)." *Jones v. State*, 284 So. 3d 855, 861 (¶19) (Miss. Ct. App. 2019). When applying the *Blockburger* test, we "determine whether each offense contains an element not present in the other; if not, they are labeled the same offense for double-jeopardy purposes, and successive prosecutions and/or punishments are constitutionally barred." *Id.* (quoting *Graves*, 969 So. 2d at 847 (¶8)).

¶76. Despite Harris's assertions, we find that Counts I and II of his indictment charged "two separate and distinct offenses, each containing at least 'an element not present in the other.'" *See Jones*, 284 So. 3d at 861-62 (¶22) (quoting *Graves*, 969 So. 2d at 847 (¶8)). To prove Count I, the State had to demonstrate that Harris "intentionally possesse[d], receive[d], retain[ed,] or dispose[d] of stolen property knowing that it ha[d] been stolen or having reasonable grounds to believe it ha[d] been stolen . . . ." For Count II, the State had to show that Harris "possesse[d] a motor vehicle . . . with knowledge that the [VIN] of the motor vehicle . . . ha[d] been altered . . . ." Thus, proof that the VIN of Harris's truck had been altered was not necessary to prove the receipt-of-stolen-goods charge. Additionally, proof

that Harris knew, or had reasonable grounds to believe, that his truck had been stolen was not necessary to prove that he was in possession of a truck with an altered VIN. Accordingly, we find Harris's claim that Counts I and II of his indictment subjected him to double jeopardy lacks merit.

## VIII. Constitutional Speedy-Trial Violation

¶77. At the post-trial motion hearing, Harris (pro se) asserted ore tenus "that a speedy trial violation is warranted . . . since the United States [C]onstitution claims that a pertinent part in all criminal prosecutions, the accused shall enjoy the right to a speedy trial." After Harris admitted that he had not made any demand for his right to a speedy trial before or during the trial proceedings, the circuit court overruled his motion. On appeal, Harris asserts a violation of his constitutional right to a speedy trial. In every criminal prosecution, "the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend. VI; *accord* Miss. Const. art. 3, § 26. In addressing a defendant's claim that his constitutional speedy-trial right has been violated, we employ the balancing test set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), and consider the following factors: "(a) length of delay; (b) reason for delay; (c) defendant's assertion of his or her right to a speedy trial; and (d) prejudice to the defendant." *Brown v. State*, 285 So. 3d 671, 681 (¶39) (Miss. Ct. App. 2019). We view the four factors "in totality[,] and no single factor alone is dispositive." *Id.*

### A.    *Length of Delay*

¶78. As this Court held in *Brown*, "An eight-month delay is presumptively prejudicial. In

calculating the length of delay for a constitutional speedy[-]trial claim, the clock begins to run once a person has been accused. This can be when there is a formal indictment or information, or when a person has been arrested." *Id.* at (¶41) (citing *Smith v. State*, 550 So. 2d 406, 408 (¶¶12, 15) (Miss. 1989)). Harris was arrested on May 17, 2016; he was formally indicted on May 5, 2017; and his trial began on September 11, 2017. Thus, we find the delay of approximately sixteen months was presumptively prejudicial.

### B. Reason for Delay

¶79. "Once a delay is found to be presumptively prejudicial, the court must determine whether the delay should be charged to the State or the defendant." *Sullivan v. State*, 281 So. 3d 1146, 1164 (¶45) (Miss. Ct. App. 2019). "The burden of proof shifts to the State to show the good cause for any delay attributed to it." *Id*. (citing *Stark v. State*, 911 So. 2d 447, 450 (¶6) (Miss. 2005)). The record does not indicate that either the State or Harris requested any continuances or took any actions that would have intentionally delayed Harris's trial. In fact, as Harris correctly notes, "[t]he record is silent as to the cause of the delay." And the State, which did not address this issue on appeal, has failed to demonstrate any reason for the delay.

¶80. This Court has held, "Where the record is silent regarding the reason for the delay, then the time is counted against the State because the State bears the risk of non-persuasion on the good cause issue." *Travis v. State*, 13 So. 3d 320, 328 (¶26) (Miss. Ct. App. 2008) (citing *Vickery v. State*, 535 So. 2d 1371, 1375 (Miss. 1988)). Although the State has provided no reason(s) for the delay, which weighs this factor in favor of Harris, we do note

that the majority of the delay (353 days) occurred between Harris's arrest and his indictment.

The supreme court recognized in *State v. Woodall*, 801 So. 2d 678, 682 (¶15) (Miss. 2001):

> [I]t requires no extended argument to establish that prosecutors do not deviate from "fundamental conceptions of justice" when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause. It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt.

(Quoting *United States v. Lovasco*, 431 U.S. 783, 790-91 (1977)). "[I]nvestigative delay is fundamentally unlike delay undertaken by the [g]overnment solely to gain tactical advantage over the accused." *Id*. (internal quotation marks omitted) (quoting *Lovasco*, 431 U.S. at 795). Therefore, taking into consideration that this presumptively prejudicial period of delay occurred during the investigatory period of Harris's case, we find this factor weighs only slightly in favor of Harris.

### C.    *Assertion of Right*

¶81.    While a defendant's assertion of his speedy-trial right weighs in his favor, his failure to assert the right weighs in the State's favor. *Brown*, 285 So. 3d at 682 (¶47). Harris acknowledged that neither he nor his attorney had filed a demand for a speedy trial at any time throughout the trial proceedings. Moreover, he waited until after trial to request dismissal based on his claim of a speedy-trial violation. "[A] demand for a speedy trial is distinct from a demand for dismissal due to violation of the right to a speedy trial." *Brengettcy v. State*, 794 So. 2d 987, 994 (¶17) (Miss. 2001) (citing *Perry v. State*, 637 So.

40

2d 871, 875 (Miss. 1994)). Because Harris never demanded a speedy trial and waited until after trial to move for dismissal for failure to provide a speedy trial, we find that this factor weighs in favor of the State.

### D. Prejudice to the Defendant

¶82. "The defendant bears the burden of persuasion under the prejudice prong" of our analysis. *Id.* at (¶49). "[W]ithout a showing of any prejudice, this prong of the balancing test cannot weigh in favor of the defendant." *Id.* (quoting *Johnson v. State*, 68 So. 3d 1239, 1244 (¶15) (Miss. 2011)). A defendant may establish prejudice by showing the following: "(1) pretrial incarceration; (2) anxiety and concern of the accused; or (3) impairment of the defense." *Id.*

¶83. In his pro se brief, Harris contends the delay in his trial prejudiced him "because he could not locate" two potential witnesses "to have them at trial." Although Harris claims that the witnesses' testimony would have aided his defense, he fails to demonstrate how any presumed trial delay prevented him from securing the two witnesses' presence at trial. The record contains no evidence to show that the defense tried to subpoena the two potential witnesses or made any attempts whatsoever to locate them. Because Harris has failed to prove any actual prejudice under this prong, we find that this factor weighs against him.

¶84. In summary, the only factors that weigh in Harris's favor are the length of the delay and the reason for the delay, albeit only slightly. The two remaining factors weigh against Harris. The supreme court has held that when "the other factors are neutral or only slightly

41

in [a defendant's] favor, at best, the unquestionable lack of actual prejudice outweighs the other factors." *Taylor v. State*, 162 So. 3d 780, 787 (¶17) (Miss. 2015). Due to the absence of any prejudice in this case as a result of the delay, and Harris's failure to assert any demand for a speedy trial until after the proceedings, we find no error in the circuit court's decision to overrule Harris's ore tenus motion.

## IX. Prosecutorial Misconduct

¶85. Harris also contends that the State committed prosecutorial misconduct during its closing argument by questioning the existence of the notary public who signed the title application and by referring to Harris as a "con man." The record reflects, however, that the defense raised no contemporaneous objections to these comments.[5] "To preserve an objection to alleged improper remarks by counsel during closing argument, the complaining party must not only make a contemporaneous and specific objection to the remarks, but must also obtain a definitive ruling from the trial court on his objection and must request corrective action." *Stewart v. State*, 291 So. 3d 738, 748 (¶38) (Miss. 2020) (quoting *Rials v. Duckworth*, 822 So. 2d 283, 287 (¶22) (Miss. 2002)). Because Harris failed to object to the State's comments during closing argument, he is procedurally barred from raising this issue on appeal.

---

[5] The defense first raised an objection to the State's closing-argument comment about the notary in its post-trial motion. At the hearing on the post-trial motion, Harris raised additional pro se arguments, asserting for the first time that the State had committed further prosecutorial misconduct by referring to him as a "con man" during closing arguments.

## X. Ineffective Assistance of Counsel

¶86.    Harris asserts that his trial attorneys rendered ineffective assistance of counsel by committing various alleged errors, including but not limited to counsels' failure (1) to raise a claim for Harris's right to a speedy trial; (2) to acquire an appraisal for the truck's value; (3) to subpoena various witnesses; and (4) to object to non-specified jury instructions. "Generally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020). However, such claims may be addressed on direct appeal "when '[(1)] the record affirmatively shows ineffectiveness of constitutional dimensions, or [(2)] the parties stipulate that the record is adequate[,] and the [appellate court] determines that the findings of fact by a [circuit] judge able to consider the demeanor of witnesses, etc., are not needed.'" *Id.* (quoting *Bell v. State*, 202 So. 3d 1239, 1242 (¶12) (Miss. 2016)). Ineffective-assistance-of-counsel claims have also been resolved "on direct appeal when the record affirmatively shows that the claims are without merit." *Id.* "Where the record cannot support an ineffective assistance of counsel claim on direct appeal, the appropriate conclusion is to deny relief, preserving the defendant's right to argue the same issue through a petition for post-conviction relief." *Pace v. State*, 242 So. 3d 107, 118 (¶28) (Miss. 2018).

¶87.    Because the parties have not stipulated to the adequacy of the record, and the facts surrounding Harris's claims of ineffective assistance of counsel are not fully apparent from the record, we deny Harris's claim without prejudice to his right to seek permission from the

supreme court to file a motion for post-conviction relief.

## CONCLUSION

¶88.    We affirm the circuit court's judgment as to Harris's convictions in Counts I and II. Finding there was insufficient evidence to support the jury's verdict as to Count III, we reverse the circuit court's conviction and sentence on Count III and render a judgment in Harris's favor as to that charge.

¶89.    **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD AND LAWRENCE, JJ., CONCUR.  CARLTON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. McCARTY, J., NOT PARTICIPATING.**

**CARLTON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶90.    I concur with the majority's opinion affirming Harris's convictions and sentences for Counts I and II.  However, I respectfully dissent as to the majority's decision reversing and rendering Harris's conviction and sentence for Count III (making fraudulent statements and representations to defraud the government).  In accordance with the applicable standard of review, I find that there was sufficient evidence to support Harris's convictions and sentences on all three counts and would affirm the trial court's judgment.

¶91.    As the majority recognizes, in reviewing the sufficiency of the evidence, we must review "the evidence in the light most favorable to the State[,]" *Donaldson*, 262 So. 3d at 1145 (¶16), and, further, we must "accept all credible evidence consistent with guilt as true *and give the State the benefit of all favorable inferences reasonably drawn from the*

44

*evidence.*" *Moore v. State*, 160 So. 3d 728, 735 (¶31) (Miss. Ct. App. 2015) (emphasis added) (internal quotation marks omitted).

¶92. The majority finds that Harris did not knowingly or willfully "produce" the title application with the intent to defraud Sergeant Conner because the officer discovered the title application only after requesting Harris's consent to search the truck. I disagree. I find that Harris, by giving his consent to search the truck, knowingly "produced" the fraudulent title application. Harris knew the title application was in the truck, and Sergeant Conner discovered it as a direct result of Harris's consent. Additionally, the record reflects that Harris "produced" the title application when he gave the fraudulent information to the Claiborne and Warren County tax collectors in order to obtain the title and tag to operate the truck. I recognize that Count III of the indictment does not charge Harris with the intent to defraud the tax collectors, but I find it significant that had he not done so, Harris would not have been able to get a tag and drive the truck in the first place. Applying the "sufficiency of the evidence" standard of review stated above, I find that these facts, taken together, create a reasonable inference that Harris knew that when he consented to Sergeant Conner searching the truck, Harris knew the officer would find the fraudulent title application— Harris effectively "produced" it. Accordingly, I would affirm the trial court's decision on all counts.